For the reasons stated the judgment should be affirmed. It is so ordered.

All concur.

THE STATE v. WEST, Appellant.

**Division Two, March 5, 1907.**

1. **INSTRUCTIONS: General Objection.** Where defendant objects and excepts to the giving of the instructions on the ground that they do not cover all the facts of the case and are not sufficient under the law, and his counsel is thereupon requested by the court to state what questions are not fully covered by the instructions and makes no reply, he is in no position, on appeal, to urge objections to the instructions.

2. **MURDER: Instruction on Second Degree: Evidence of First Degree: Rule Since 1879.** While it was the law of this State prior to the revision of 1879, that it was reversible error to instruct on murder in the second degree where the evidence showed murder in the first degree alone, the Legislature enacted section 1654, R. S. 1879 (now sec. 2369, R. S. 1899), for the purpose of changing the rule; and since the enactment of that section a defendant convicted of murder in the second degree can not complain that the court instructed on murder in the second degree when the evidence showed him to be guilty, if at all, of murder in the first degree.

3. ———: **Instruction: Defining "Deliberately."** A definition of the term "deliberately," set out in the opinion, held proper.

4. ———: **Second Degree: Instruction.** An instruction on murder in the second degree, set out in the opinion, held to be in approved form.

5. **MANSLAUGHTER: Instruction: Admission by Counsel.** Where defendant's counsel contends in his brief in the appellate court that the crime was either murder in the first degree or noth-

ing, he is in no position to insist that the court should have instructed on manslaughter in the fourth degree.

6. ———: ———: **No Evidence.** Where, as in this case, there is no evidence of passion or of words of insult or reproach, but the evidence shows either murder or self-defense, no instruction on manslaughter in the fourth degree should be given.

7. **MURDER: Sufficiency of Evidence.** Evidence held sufficient to have justified the jury in convicting defendant of first degree murder, and, therefore, sufficient to support the verdict finding him guilty of murder in the second degree.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

AFFIRMED.

*John A. Gernez* for appellant.

(1) Where the evidence in the case shows that the crime is either murder in the first degree or nothing, no instructions for murder in the second degree or manslaughter in the fourth degree should be given. State v. Pollard, 139 Mo. 220; State v. Cockran, 147 Mo. 518; State v. Brown, 119 Mo. 538; State v. Williams, 141 Mo. 316; State v. Hopper, 71 Mo. 425; State v. Sund, 91 Mo. 559. And if a defendant is guilty of murder in the first degree or no crime at all, it is reversible error to instruct on murder in the second degree, if he is found guilty of that offense. State v. Stoeckli, 71 Mo. 559; State v. Mahly, 68 Mo. 315; State v. Alexander, 66 Mo. 160; State v. Phillips, 24 Mo. 480; State v. Punshon, 124 Mo. 457. (2) The court erred in defining "deliberately" in relation to murder in the second degree. To constitute murder in the second degree there must exist on defendant's part, at the time of homicide, a "heat of passion," engendered by a "just provocation," that will negative the existence of "deliberation." State v. Ellis, 74 Mo. 207; State v. Weakley, 178 Mo. 413. And when there is evidence of a just

provocation, engendering passion, it is the duty of the
court to declare, as a matter of law, whether the provo-
cation sought to be established is such as will mitigate
the homicide, and if so to leave to the jury whether
such provocation and passion did in fact exist. State
v. Ellis, 74 Mo. 220; State v. Taylor, 171 Mo. 477; State
v. Donnelly, 130 Mo. 647. (3) The court should have
instructed on manslaughter in the fourth degree. 2
Bish., New Crim. Law, sec. 699; 1 McClain's Crim. Law,
sec. 336; Wharton on Homicide, secs. 430, 431; State v.
Reed, 154 Mo. 130; State v. Bowles, 146 Mo. 15; State
v. Garrison, 147 Mo. 566; State v. McKenzie, 102 Mo.
632; State v. Weakley, 178 Mo. 413.

*Herbert S. Hadley,* Attorney-General, and *N. T.
Gentry,* Assistant Attorney-General, for the State.

(1) Defendant did not object to the instructions
for any reason other than that they did not fully in-
struct the jury on all of the law applicable to the case.
This fact is further emphasized by the record recital
that the court then asked defendant's counsel upon
what other points they desired to have the jury in-
structed. By restricting his objection to said instruc-
tion to one reason, and by assigning that one, the de-
fendant cannot now complain of said instructions for
any other reason. State v. McCarver, 194 Mo. 717.
Again, if said instructions were not full and complete,
it was defendant's duty to state to the court wherein
they were incomplete, and to give the court an oppor-
tunity to give additional instructions; a simple objec-
tion or exception on that subject was not sufficient.
State v. Bond, 191 Mo. 563; 1 Bishop's New Crim.
Proc., sec. 1061. (2) No error was committed in fail-
ing to instruct the jury on the subject of manslaughter
in the fourth degree. In the first place, defendant
never asked any instruction on that subject, and did
not specially save his exceptions to the failure of the

court to instruct on that subject, at the time of such
failure. In the second place, there was no evidence to
warrant an instruction on the subject of manslaughter.
State v. Bailey, 190 Mo. 257. (3) The State's evidence
was sufficient, if believed by the jury, to have justified
the conviction of defendant of even murder in the first
degree. As the jury convicted him of an offense less
than he was really guilty, defendant cannot be heard to
complain. State v. Todd, 194 Mo. 337; R. S. 1899, sec.
2369.

GANTT, J.—On the second day of December, 1905,
the grand jury of the city of St. Louis returned an
indictment against the defendant, John West, and one
Fred Jackson, charging them with murder in the first
degree of one Ike Coleman on the 30th of July, 1905.
The case was tried on the 25th of January, 1906, and
resulted in an acquittal of Jackson and the conviction
of the defendant, West, of murder in the second degree,
and affixing his punishment for ten years in the peni-
tentiary. Motion for a new trial was filed in due time
and overruled, and the defendant appeals.

The evidence in the case on the part of the State
tended to establish that the defendant, the deceased,
Fred Jackson and most of the witnesses on both sides
were negroes. On Sunday morning, July 30, 1905, be-
tween twelve and one o'clock, there was trouble between
the deceased and one Wesley House on the one side, and
the defendant and one Fletcher on the other side. These
four had been in a restaurant on 23d street, between
Morgan and Franklin, and the defendant and Fletcher
left first, the deceased and House leaving later on. As
the deceased and House approached the defendant on
the sidewalk, the defendant stooped in the gutter and
picked up a stick and said, ''What are you s— of a b—
doing following us?'' The defendant then hit at the
deceased, drew a knife and tried to cut him, but was
prevented. Witness Williams testified that after this

difficulty he saw the defendant in an alley in the rear of Morgan street, between Twenty-second and Twenty-third streets, and heard defendant say to Lonnie Bell, ''Give it to me, I will go around.'' And thereupon Bell handed the defendant a bright, shiny pistol, and the defendant and Jackson went around together out of the alley and on to Morgan street.

Thomas Ewing was standing on the corner of Morgan and Twenty-third and saw the defendant and Jackson walking together as they passed him, the defendant holding a pistol in his right hand. In a few minutes Ewing and officer Roach heard two pistol shots on the south side of Morgan street near Twenty-third street, and the officer immediately ran to the place of the shooting. There was an interval of about two or three seconds between the two shots and the sound indicated that they were fired out of a pistol. The officer found the deceased lying flat on his back in the middle of the sidewalk, his left hand along side of him and his right hand across his breast; the right hand was clinched, but there was nothing in it; the left hand was open. A crowd soon gathered around, but the defendant was next to the deceased and would allow no one to get near his body. When the officer inquired about the trouble, the defendant said, ''I shot him; the man has got a revolver.'' The defendant then gave his pistol to the officer and surrendered himself. By the side of the deceased, and a little above the wound in his body, the officer found a large black pistol lying on the pavement. Another officer, Burke, arrested Wesley House, who was running away, and also arrested Fred Jackson, who was still in the crowd near the deceased's body.

Wilson Davis testified that he was walking away from the defendant and Jackson when he heard the first shot fired; he had just seen the deceased Coleman walking east on the same side of the street with himself and the defendants West and Jackson following behind him

in the same direction. When the first shot was fired, he at once looked around and saw the defendant fire the second shot and heard Jackson say, "Don't run, don't run." By that time the deceased reeled around and fell on the sidewalk. This witness further testified that after the deceased fell, Fred Jackson ran to him, raised up his coat and placed a pistol by the side of the deceased's body. About this time the defendant West turned to the witness and said, "Damn you, don't go to him." Dr. Abeken, who held the post-mortem examination over the body of the deceased, testified that death resulted from a gun shot wound, which entered the front part of the deceased's body and penetrated the heart. He gave it as his opinion that this wound produced instant death, or was sufficient, at least, to have prevented the deceased from doing anything with his arms or hands. James Lusk testified that, when the second shot was fired, the deceased fell; this shot was fired by a man on the edge of the sidewalk.

On the part of the defendants, the testimony tended to show that the defendant had had trouble with the deceased on the night of the homicide, and that the deceased was the aggressor; that the defendant was afterwards warned by one Allen Anderson that deceased was looking for him and ready for him. Lonnie Bell testified that he and the defendant after midnight were on the southwest corner of Twenty-third and Morgan, near Brown's saloon, and that he and the defendant and one Fletcher went up Morgan street to get some tobacco and then returned to the same corner; when they got there, he saw the deceased and Wesley House coming towards them. The deceased had a pistol in his hand and House had his hand up. This witness ran on east as soon as he saw the gun in the hands of the deceased and he reached the Chinese restaurant some five minutes before Fletcher, the other party that

was with defendant, got there. While in this restaurant, he heard the two shots fired.

One Henry Revere testified that sometime after midnight on July 30, 1905, he was in Simon Brown's pool-room playing pool with one Allen Anderson, when the deceased came into the pool-room alone, "The deceased had a big gun in his bosom, sized everybody up and walked out." Shortly afterwards witness and Anderson left the pool-room and sat down on the street; there they met the defendant West, with a man that the witness did not know; he left these parties and saw the deceased on the sidewalk going east on Morgan street, the deceased having his hand in his bosom. On cross-examination, however, he stated that the deceased had the weapon in his hand down by his side when he came in, but shoved it in his bosom when he went out. Allen Anderson testified to seeing the deceased, Coleman, and House following the defendants John West and Fletcher, and when they got near to the corner of Twenty-third and Morgan streets, the deceased and House rushed after defendant and Fletcher with knives. Later on that night, while witness was seated on the street, the deceased stopped and looked in his face and went on. Ten minutes later, the defendant came along and witness told defendant to be careful, they were looking for him with guns. Fred Jackson, one of the defendants, testified, in his own behalf, that about three minutes to one o'clock that night, he came out of 2305 Morgan street, he fixed the time by having looked at the clock, he went to the corner and meeting the defendant John West he invited him to Brown's club for a drink; they started towards the club east of Morgan street from Twenty-third; when they got about thirty-five yards from the corner, he saw the deceased, Ike Coleman, running down the street towards them; the deceased stuck his hand in his bosom and took out a pistol and shoved it into his pocket; the defendant and Jackson continued their walk down the street, when

Jackson says he turned and looked and saw Coleman about six feet from the defendant West; that the deceased had his pistol pointed at West and snapped it twice, and the defendant had his hand in his pocket when he pulled out his pistol and shot Coleman. Coleman fell flat on his back, and then raised up from the flat of his back and shot over his arm and then fell back again on his back and his right hand clinched over his breast and his left hand close over his side. This witness denied having placed the weapon by the body of the deceased and denied that he had been in the alley referred to by the witness Williams, earlier in the evening with the defendant, and denied seeing Bell give the defendant West a revolver. The defendant West testified in his own behalf that on the night of the 30th of July, 1905, about ten minutes after midnight, he first saw Ike Coleman, the deceased, and Wesley House at Harry Parker's restaurant. The defendant and Fletcher had gone to the restaurant and were in there when Coleman and House came in. The deceased and House left the restaurant before defendant and Fletcher, and when defendant and Fletcher came out, the deceased and House were standing on the outside with drawn knives. Defendant and Fletcher, and a woman with them, went south on Twenty-third street and when they got to Morgan street, House commenced cutting at the defendant West, and the defendant stepped into the street and got a broom-stick and ran House down the street, knocking the knife out of his hand; in the meantime, the deceased, Coleman, had run across the street after Fletcher, and the defendant thereupon ran him down the street. Later on, after the defendant and some others had gone west on Morgan street to get some tobacco, they were standing on the corner of Twenty-third street and Morgan street, near Brown's saloon, when Coleman and House returned. The deceased, Coleman, had a big black pistol and House had his hand "as though it were a gun."

The defendant ran and he saw no more of them until after the shooting. He had seen Anderson a short time before the shooting and Anderson had told him "he had better look out, the fellows were after him with a big pistol." Just then he met his co-defendant, Jackson, and asked him to go with him to Brown's club to get a drink. They went down the south side of Morgan street towards the club, and as they were walking along, Jackson called his attention to some one following them; he turned and saw the deceased behind him with a pistol. At first he did not pay much attention, but he looked again and the deceased snapped his pistol twice and it failed to fire; thereupon defendant drew his revolver and fired one shot. His revolver after its discharge had two empty chambers, but one had been discharged on the fourth of July, and had been empty ever since. Coleman, the deceased, fell and Jackson said to defendant, "I would not run, you could not help doing it." After shooting Coleman, the defendant jumped into the street, and the deceased, after he fell, reached over and shot one shot at him. The defendant denied receiving the revolver from Bell.

The foregoing is practically all the material evidence in the case.

I. The indictment is sufficient both in form and substance and is in all essentials identical with the indictments which were approved by this court in banc in State v. Wilson, 172 Mo. 420; State v. Gray, 172 Mo. 430; State v. Heinzman, 171 Mo. 629.

II. The defendant assails the instructions in this court, but when the instructions were given, the record shows that the only objection made to them was the following: "To the giving of which instructions by the court as aforesaid the defendants by their counsel then and there duly excepted on the ground that they did not entirely cover all the facts of the case under the law and as not being complete and sufficient under the law."

When this objection was made in this form, the record further recites that thereupon "the court then requested defendant's counsel to state which questions, if any, were not fully covered by the instructions given, to which he (the counsel) made no reply." It will thus be observed that the defendant did not object to the instructions given for any error in them, but his sole complaint was that they did not go far enough to cover the law applicable to the case. In State v. McCarver, 194 Mo. 742, this court, speaking to this point, said of a similar objection: "The only construction which can be placed upon this objection is that the instructions did not cover all the points of law involved in the case, and not that they were in any respect erroneous. We have held that when the instructions of the court are read to the jury, and the defendant desires further instructions, it is his duty, in fairness to the court, to call its attention to any matter of law arising in the case upon which the court had failed to instruct, and which was deemed necessary by the defendant to be placed before the jury in order that they might arrive at a just verdict, and in the event of the failure of the court to so instruct, it becomes the duty of the defendant to except at the time. [State v. Bond, 191 Mo. 555.]" So that we might well dismiss the objections now urged to the giving of an instruction on murder in the second degree and to other supposed defects in the instructions on the ground that the defendant made no proper objections thereto in the circuit court. But conceding that the instructions were timely challenged in the circuit court, did the court err in instructing on murder in the second degree? In its instruction on murder in the first degree, the court defined the word "deliberately" as follows: "Deliberately means done in a cool state of the blood, it does not mean brooded over or reflected upon for a week, a day or an hour, but it means an intent to kill executed by the defendant in a cool state of the blood in furtherance of a formed

design to gratify a feeling of revenge or to accomplish some other unlawful purpose and not under the influence of a violent passion suddenly aroused by some lawful or just cause or provocation.'' The court then defined murder in the second degree as follows: ''Murder in the second degree is the killing of a human being wilfully, premeditatedly, and with malice aforethought, but without deliberation. Bearing in mind the definition heretofore given of the term 'wilfully,' 'premeditatedly,' and 'with malice aforethought,' if you find and believe from the evidence that at the city of St. Louis and State of Missouri, on or about the 30th day of July, 1905, or at any time before the finding of the indictment herein, the defendant wilfully, premeditatedly and with malice aforethought, but not deliberately, shot with a pistol one Ike Coleman, and further find from the evidence that within a year and a day after such shooting, to-wit, on or about the 30th of July, 1905, the said Ike Coleman died from the effects of such shooting and wounding done by the defendants or either of them aforesaid, you will find such defendant or defendants guilty of murder in the second degree, and unless you find the facts so to be, you will acquit him or them of murder in the second degree.'' It is now objected that the court erred in giving this instruction on murder in the second degree for two reasons, the first being that if the defendant was guilty at all he was guilty of murder in the first degree and it was therefore reversible error to instruct on murder in the second degree. In support of this contention we are cited by the learned counsel for the defendant to State v. Mahly, 68 Mo. 315, in which it was held reversible error to instruct on murder in the second degree when the evidence tended to show that defendant was guilty of murder in the first degree alone and there was no evidence to support a charge of murder in the second degree.

That decision was based upon other decisions of this court prior thereto, all of which were decided before the revision of 1879, in which, for the first time, it was provided: "Upon indictment for any offense consisting of different degrees, as prescribed by this law, the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty of any degree of such offense inferior to that charged in the indictment, or of an attempt to commit such an offense, or any degree thereof; and any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide." [Sec. 1654, R. S. 1879.] Afterwards, in State v. Stoeckli, 71 Mo. 559, the rule announced in State v. Mahly was followed and approved, but it is interesting to note that this last case reached this court by appeal from the St. Louis Court of Appeals and in the 8th Mo. App. 597, it was said by the Court of Appeals: "Where the inevitable inference from the facts was that the crime was murder in the first degree, and that the only question was whether the defendant committed the act, it was, prior to the revision of 1879, error to instruct as to both degrees of murder." So that it would appear from this report of the case that that cause was tried in the criminal courts prior to the taking effect of the revision of 1879. So that while it was the decided law of this State that it was reversible error for the court to instruct upon murder in the second degree where the evidence tended to show murder in the first degree only, prior to the enactment of section 1654 in the revision of 1879, it seems obvious that such section was enacted by the Legislature for the purpose of changing the rule announced in State v. Mahly, 68 Mo. 315, and other cases announcing that doctrine. Accordingly, as late as State v. Todd, 194 Mo. l. c. 394 and

395, it has been ruled by this court that even if the testimony did not warrant an instruction for murder in the second degree, "the defendant is in no position to complain, for if the court erred in instructing for a lesser degree of murder than that with which the defendant is charged, it was an error in the defendant's favor, of which he has no cause to complain," citing section 2369, Revised Statutes 1899, which is the same as section 1654, Revised Statutes 1879, and also section 2535, Revised Statutes 1899, which provides that no judgment shall be affected ". . . for any error committed at the instance or in favor of the defendant; nor because the evidence shows or tends to show him to be guilty of a higher degree of the offense than that of which he is convicted." And the same rule was announced in State v. McMullin, 170 Mo. l. c. 630; State v. Frazier, 137 Mo. l. c. 340; State v. Scott, 172 Mo. 536. While there may be some cases since the enactment of section 1654, Revised Statutes 1879, now section 2369, Revised Statutes 1899, which hold it is reversible error to instruct on murder in the second degree if the evidence tends to prove murder in the first degree, or no crime at all, and the defendant is found guilty of murder in the second degree, it must be held that the statute just quoted is controlling, and the recent decisions of this court have given it full effect, and, therefore, the defendant in this case is in no position to complain that he was convicted of murder in the second degree when the evidence showed him guilty of murder in the first degree. And accordingly this assignment of error must be ruled against the defendant.

III. The point advanced by the defendant that the court erred in defining "deliberately" in relation to murder in the second degree is without merit. It was entirely proper for the court to advise the jury as to the elements which constituted each degree of mur-

der. Its definition of murder in the second degree is one that has often met the approval of this court.

IV. It is next insisted that the court should have instructed on manslaughter in the fourth degree. A complete answer to this contention is found in the defendant's own brief, wherein he states that the testimony shows that the crime was either murder in the first degree or nothing, and that no instruction for murder in the second degree or manslaughter in the fourth degree should have been given. But one of two theories could have been accepted by the jury, either that of murder or self-defense. There was no manslaughter in the case. There was not the slightest evidence of passion, no words of reproach or insult, and no evidence even from the defendant that he shot the deceased in the heat of passion.

As was said in State v. Rider, 95 Mo. l. c. 484, "It does not follow because the evidence may warrant an instruction on justifiable homicide, that there must necessarily be one given on murder in the second degree, or some lower degree of homicide." [State v. Bailey, 190 Mo. 257.] In this case the testimony of the defendant himself as to what occurred at the time of the fatal shooting, if believed by the jury, constituted a complete defense. While it is true that there are cases in which the facts will justify an instruction not only for self-defense, but for manslaughter in the fourth degree, we find no such evidence in this case; the defendant was either guilty of murder or he was entitled to go acquit. [State v. Sneed, 91 Mo. 552; State v. Wilson, 86 Mo. 520.] But in addition to the foregoing reasons, it is clear that the defendant is in no position to complain of the failure of the court to instruct on manslaughter, because when the court finished its instructions to the jury, the learned judge inquired of the defendant's counsel if there were any other points of law upon which he desired to have the court instruct,

and the counsel made no request for an instruction on manslaughter. Courts of justice are organized and maintained for the solemn business of administering justice and are entitled to be treated with fairness and proper consideration, and when, in this case, an opportunity was specially given to counsel to suggest to the court that an instruction on manslaughter should be given, he expressly declined to make such a request of the court. As we have already said, the defendant cannot now complain in this court that he was refused an instruction in the circuit court which he expressly refused to request.

V. The court gave an exceedingly liberal instruction on the law of self-defense, one that has often been approved by this court. There seemed to be little room for doubt that the defendant fired both of the shots which were heard by the officers and other witnesses at the time of the homicide, and there was absolutely no doubt that the defendant fired the shot that killed the deceased. There was ample evidence of a deliberate preparation on the part of the defendant to kill the deceased, and the jury might well have disregarded the story detailed by defendant and Jackson, to the effect that the deceased snapped his pistol at the defendant twice. Of course, the evidence tending to show that, after the deceased had been shot through the heart, he then drew himself together and fired at the defendant, was so utterly unreasonable in the first place, and even if true, in no manner changed the legal complexion of the case, that the jury were fully warranted in disregarding all this evidence as unworthy of credence.

From full consideration of all the evidence, we are of the opinion that the jury would have been fully justified in convicting the defendant of murder in the first degree, and he has cause to congratulate himself that the jury found him guilty of murder in the second de-

gree only.   We are unable to discover any reversible error in the record and the judgment must be and is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.