## THE STATE v. CHARLES ANDERSON BARKER, Appellant.

### Division Two, February 2, 1909.

1. **INDICTMENT: "With."** The word "with" in the indictment, in the clause, "Did make an assault and with a dangerous and deadly weapon. . . . did feloniously . . . . shoot off and discharge," should have been omitted, but its use did not render the indictment bad.

2. **MURDER: To Avoid Arrest: Insanity.** To say that every wanton and unjustifiable homicide indicates or establishes insanity, is untenable. Where a tramp shot and killed an officer without any provocation whatever, and where it is fairly deducible from the State's evidence that he killed him because he thought the officer intended to arrest him, the appellate court would not be justified in setting the verdict of guilty aside on the ground that defendant's wholly unjustifiable act establishes his insanity.

3. **———: Insanity: State's Case.** Where defendant without any provocation shot an officer who was looking for him; where it is fairly deducible from the State's evidence that he did so to avoid arrest; where he very soon afterwards hid behind a tree and undertook to shoot a doctor who was coming to attend the wounded officer; and where the testimony indicates that immediately after he was wounded by this doctor he was rational; that he gave as his reason for shooting the doctor that it was in self-defense; that he said he shot the officer because he thought "he was going to club me;" and that he gave a perfectly rational account of his encounter with the officer—all of these facts being established by the State—the

State v. Barker.

court would not have been justified in directing an acquittal on the ground of insanity, at the close of the State's case.

4. ———: ———: **As A Defense: Question for Jury.** The question of defendant's insanity is one of fact to be determined by the jury; and when the unlawful killing is proved by the State or admitted by the accused, the State may rest upon the legal presumption of his sanity until he shows to the contrary. The burden of establishing defendant's insanity rests upon him; and though he offers much evidence tending to show he was insane, and had been for years, the question of fact still remains to be determined by the jury's verdict, under proper instructions.

5. ———: ———: **Necessary Proof.** Defendant's insanity need not be established beyond a reasonable doubt. Evidence to reasonably satisfy the jury that it existed at the time the offense was committed, is sufficient. It is sufficiently established by the preponderance of the evidence.

6. ———: ———: **Instruction: Presumptively Insane: Not Requested.** Even though defendant was, under the facts, entitled to the presumption that he was insane at the time of the homicidal act, if the jury believed he had recently prior thereto been insane, yet if he asked no instruction incorporating that principle of law, even when his counsel were by the court requested to suggest any proposition of law arising upon the facts which they desired to have submitted to the jury, the judgment cannot be reversed because no such instruction was given. Especially should this be the ruling if the court, of its own motion, gave full and ample instructions on the subject of insanity.

7. ———: **Instructions on Second Degree.** Where the jury found defendant guilty of murder in the first degree, it can avail him nothing that the court instructed on murder in the second degree.

8. ———: **Instructions for Manslaughter.** Where the homicide was either murder in the first degree, or no crime at all because of defendant's insanity, and there is no evidence tending to show any lawful or reasonable provocation for the homicidal act, the court does not err in refusing an instruction on manslaughter.

9. ———: **Insanity: Passion and Prejudice of Jury.** Where there was much evidence that defendant had been insane for years, but on the other hand that he had been simply an incorrigible, and at the time of the homicidal act and afterwards was sane, the verdict of guilty will not be set aside on the ground that it was a result of prejudice and passion on the part of the jury against a tramp who shot an officer to avoid arrest.

Appeal from Franklin Circuit Court.—*Hon. N. M. Bradley*, Special Judge.

AFFIRMED.

*Jesse H. Schaper* for appellant.

(1) The verdict of the jury ought to be set aside, because it is so palpably wrong and against the evidence as to indicate that the jury were actuated by prejudice against defendant and his defense of insanity. (a) Because the evidence produced by the State in relation to the homicidal act of defendant under the circumstances and his conduct following that act in connection with his encounter with Dr. McNay in the street of Pacific was sufficient to overcome and destroy the presumption of the sanity of defendant. (b) Because the undisputed evidence on the part of defendant shows that he is permanently afflicted with delusional insanity, which wholly impaired his power of reason from childhood. The controlling delusion is that, under its influence, he has a real and firm belief in the fact, not true in itself, that policemen or detectives constantly follow him with designs upon his life, and under the influence of this delusion he carried weapons about his person with which to defend himself against such imaginary enemies. The evidence of the homicidal act of defendant shows that he was then and there under the influence of this same delusion and under that belief he shot Kopf in supposed self-defense. (2) Instructions 1, 2 and 3, given by the court for the State, authorizing the jury that they might convict defendant of murder in the first or second degree, were erroneous. (a) Because there is no evidence to support either of them, and because the evidence is that the act of defendant in shooting Kopf, under the circumstances, was that of an insance man. State v. Speyer, 207 Mo. 556. (b) Because the evidence shows

that the act of defendant, in shooting Kopf to death, under the circumstances, was, if any offense at all, either murder in the second degree or manslaughter in the fourth degree under the statute which declares that an intentional killing without malice aforethought is manslaughter in that degree, or it was no crime at all, because of the insanity of defendant. Sec. 1834, R. S. 1899; State v. Speyer, 207 Mo. 556; State v. Dierberger, 96 Mo. 666; State v. Edwards, 70 Mo. 480; State v. Curtis, 70 Mo. 600; State v. Watson, 95 Mo. 411. (3) Instructions 6, 7, 8 and 9, given by the court for the State, defining and submitting the question of insanity of defendant as an excuse for the offense charged, are erroneous. (a) Because said instructions, although they announce in the abstract correct principles of the law applicable to insanity interposed as a defense to the commission of crimes generally, are improper and illegal in this case, in that they are not framed with reference to the habitual, permanent or chronic insanity of the defendant, such as the undisputed evidence established. It is true that said instructions are taken *verbatim et literatim* from the instructions approved by this court in the case of State v. Duestrow, 137 Mo. 44, but the two cases have nothing in common, and how can it be that the instructions approved in the latter case constitute a proper charge to the jury in the case at bar? (b) Because said instructions are improper and illegal in that they cast upon defendant the burden of proving his insanity at the time of the homicide charged, whereas under the evidence defendant was entitled to the presumption that he was insane at the time of the homicidal act, if the jury believe from the evidence that defendant was insane before and at the time he left his home in Washington, D. C., in the year 1906, for the existence of which is presumed to continue up to and at the time of the act charged, and in that case defendant was not required to prove that he was insane or of unsound mind

at the time of the act charged. But it devolved upon the State in that case, in order to convict, to prove that the act committed was done during a lucid interval. State v. Wade, 161 Mo. 441; State v. Lowe, 93 Mo. 547. (c) Because said instructions are improper and illegal in that they ignored the undisputed evidence in the case tending to prove the habitual, permanent or chronic insanity of defendant before and at the time he left his home in Washington, D. C., in 1906, and ignored the presumption of the insanity of defendant at the time of the homicidal act. State v. Wade, supra; State v. Lowe, supra.

*Herbert S. Hadley*, Attorney-General, and *F. G. Ferris*, Assistant Attorney-General, for the State.

(1) The indictment substantially charges every essential element necessary to constitute the offense of murder in the first degree, and fully informed the defendant of the nature and cause of the accusation against him. State v. Horn, 204 Mo. 528; State v. Hudspeth, 150 Mo. 19; Joyce on Indictments, p. 736. (2) (a) Instructions 6, 7, 8, 9, 10 and 11, as to insanity as a defense, are in form expressly approved by this court. State v. Duestrow, 137 Mo. 71; State v. Pagels, 92 Mo. 314; State v. Paulsgrove, 203 Mo. 200. (b) The court properly refused to instruct on manslaughter in the several degrees. There was no evidence tending to show the slightest lawful provocation for the homicide. All the evidence tended to show that he was either innocent of crime or guilty of murder. State v. Paulsgrove, 203 Mo. 207; State v. Todd, 194 Mo. 396. (3) The great issue of fact in the case is as to whether defendant was sane or insane at the time he shot Kopf. There was much evidence tending to establish defendant's insanity, but, on the other hand, there was ample evidence to justify the jury in reaching the conclusion that he was sane, and that he had the mental capacity

to distinguish between right and wrong with respect to his act. That issue was properly submitted to the jury upon fair and oft-approved instructions. The record discloses no evidence that the verdict sprang from passion or prejudice. State v. Crane, 202 Mo. 85.

GANTT, P. J.—The defendant was indicted at the November term, 1907, of the Franklin Circuit Court, for the murder of Alfred Kopf, at the town of Pacific, on the 3rd day of September, 1907. He was duly arraigned, and upon a plea of not guilty and insanity, he was tried at the March term, 1908, convicted of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life. He has appealed from that sentence.

The statements of counsel show no difference as to the substantial facts.

The evidence on the part of the State tended to prove that about six o'clock in the morning of the 3rd of September, 1907, defendant was seen leaving the home of Mr. Lynde in the town of Pacific. As he passed from the gate he threw away a sandwich. He went on in the direction of Mr. Busse's place, where soon thereafter he arrived. He applied to Mr. Busse, who was in the house alone at the time, and asked for a lunch and was granted the privilege of entering the house and washing his face. He had some conversation with Mr. Busse, in which he said he was hunting work. He desired the privilege of heating some water with which to wash his shirt, and was directed by Mr. Busse to a creek where he could do his washing. He also inquired the road to Labaddie. Mr. Busse testified that his conversation was sensible. After wiping his face and hands, he sat at the window looking into a pocket mirror and picking at his face. He went out of the house a few minutes later. Mr. Busse afterwards saw him sitting in the road looking at his glass and picking his

face. Defendant sat in the road there for some time, and then he walked further up the road, where he entered a patch of weeds by the road side, in which he lay down and thus concealed himself from view. About that time Harry Knapp, to whom some lady in the neighborhood had complained that defendant had made a disturbance, or was exciting fear, came to Mr. Busse's house and inquired as to where defendant might be found. Mr. Busse being somewhat deaf, Mr. Knapp talked in a loud tone. As Mr. Knapp told Mr. Busse that he had telephoned for the city marshal; the defendant arose in the weeds, looked around and lay down again, which act in a short time defendant repeated.

Knapp started away, but soon returned to Busse's place with Deputy Marshal Albert Kopf, who, at the time, was acting marshal. When about thirty feet from defendant, Knapp stopped and pointed out defendant's hiding place to Kopf. As Kopf approached defendant, the defendant arose, drawing his revolver as he did so, and quickly fired a shot at Kopf, which struck Kopf in the breast. Kopf, on seeing defendant draw his revolver, also drew a revolver and fired twice at defendant immediately after defendant had shot. Kopf turned, reeled and staggered a few feet and fell. Defendant in the meantime was working with his revolver, which seemed to be out of order. Knapp ran and telephoned for a doctor, and, returning, found Kopf mortally wounded, lying upon his face by the road.

Dr. McNay, responding to the call to attend Kopf, went in a buggy, in company with Mr. Blees, toward the scene of the tragedy. As they were on their way, and opposite Dr. McNay's residence, they saw the defendant approaching the street in the distance, bareheaded and bleeding, and carrying a pistol. Blees informed the doctor that defendant was the man who had shot Kopf. The doctor ran into his house and immediately returned to the buggy with his shotgun. In the

meantime, defendant stopped to examine his revolver, and then proceeded to the buggy, where Blees said to him, "Hello; have you been in a scrap?" and defendant replied, "Yes, a fellow hit me with an iron bar." Upon being asked by Blees where it happened defendant pointed back to the westward. Defendant watched the doctor's house, and as the doctor emerged therefrom with a gun, he ran across the street and took position behind a maple tree. Dr. McNay and Mr. Blees both called to him, telling him to come out from behind the tree and drop his revolver and he would not be harmed. This demand and assurance was repeated several times but defendant gave it no heed. As defendant stuck his hand around the tree, as if to get a shot at the doctor, the doctor fired a load from his shotgun at defendant's hand, which knocked defendant's revolver out of his hand, throwing it several feet away from the tree. Again commanded to come out from behind the tree, the defendant refused again. Defendant quickly made a dive for his revolver; Dr. McNay at the same time attempted to shoot the other barrel of his shotgun at defendant, but failed in doing so, because he pulled the wrong trigger. The doctor then shot the defendant in the face as he was taking aim at the doctor from behind the tree. Defendant fell, and the doctor noticing that he was not killed, proceeded in his buggy to the place where Marshal Kopf fell. During the duel between the doctor and the defendant no word was spoken by the defendant. The doctor however testified that he was acting like he knew what he was doing. Dr. McNay found Kopf suffering from a bullet wound, of which he died four days later.

When defendant was arrested and searched, which was a very short time after the shooting, there was found upon his person a map, a purse and an old pocket knife. In his clothing on one side was a gun pocket, and he also was carrying thirty-eight shells. On the way to the calaboose, J. W. Placker had a conversation

with defendant, in which, as he testified, defendant gave intelligent and responsive answers to his questions. As to this conversation, Mr. Placher was corroborated by Mr. Souders, who testified that defendant said that he fired the first shot and he only fired one shot because his gun would not work. Defendant further said that the marshal's first shot missed him, and the second shot hit him in the mouth. Dr. Booth also heard and participated in the conversation above referred to. Dr. Booth said as he noticed the formation of defendant's head, he made the remark, ''That fellow would shoot a man for fun,'' whereupon the defendant said, ''I did not shoot the marshal for fun, but I had to shoot him.'' Defendant also told Dr. Booth that there was a bullet in his mouth, which could be removed easily.

Dr. Lynde and his wife recognized the defendant as the man who had appeared at their door at about six o'clock on the morning of the tragedy and received from Mrs. Lynde a sandwich and a glass of milk. He drank the milk, started away without thanking the lady for her kindness, and threw away the sandwich as he came upon the street. Mr. Moore testified that he heard defendant, in conversation with Dr. Booth, just after arrest, say that his name was Charles Anderson, and that his home was in Washington, D. C. Mr. Moore said that he seemed to be morose.

The defendant introduced in evidence records of the Supreme Court of the District of Columbia to prove that Charles Barker, the father of the defendant, was on the 18th day of May, 1889, by a jury, declared to be a lunatic and of unsound mind, so that he had not capacity sufficient for the government of himself and his property. The depositions of defendant's mother and four other witnesses of Washington, D. C., were read in evidence, all being to the effect that defendant as a child was always hard to manage and that he would fall into a rage upon the slightest word of rep-

rimand. He surrounded himself in his room with means of defense and escape. Sometimes he slept in day and worked all night, according to a temporary health theory of his. He could not be kept in public school, and he was at different times in private schools, in a school for feeble minded, and in a reform school in Washington, where he was received as an incorrigible. He often used abusive language to his mother; on several occasions he threatened her with violence, and on at least one occasion he struck her. When he would be in a spell of violent rage, he would threaten violence to anyone making effort to control him, and at such times he would break the furniture and anything in reach. At times one winter he went about the house barefooted and in his underwear only, doing so, as he said, for his health. According to Mr. Zeigler, defendant was a victim of self-abuse. He imagined that his mother was in a conspiracy to marry him to young lady visitors at her home. He was in the reform school from November, 1901, until July, 1903, when he was paroled. He was recommitted to said school, as incorrigible, in June, 1904, where he remained about two weeks and escaped. He was shortly afterwards recaptured and held in said reform school until May 18, 1905, at which time he escaped again. The assistant superintendent of the reform school testified that he always regarded defendant as a boy of unsound mind. Dr. Stewart of Washington gave numerous instances of defendant's conduct, which had come under his own observation, and stated that defendant, at the last time he saw him, which was in July, 1906, was insane. He also testified that defendant was suffering from paranoia persecutia, and had delusions. The doctor also testified that defendant's sister was suffering from melancholia, that she was erratic, had hallucinations, and entertained a general belief that everybody was trying to do her a severe injury. Mr. Henderson, of Washington, D. C., who married the sister of defendant's mother, was

present at the trial and testified fully as to the erratic conduct of defendant's father, and said that defendant's father, after having been adjudicated insane, spent some time in an insane asylum, from which he was released on account of sickness, and soon afterwards died. He also testified as to the irritable and incorrigible disposition of defendant, and to defendant's delusions and strange conduct as a boy. Mr. Henderson had opposed the marriage of defendant's father and mother and was instrumental in getting defendant's father into an asylum; in which matter he succeeded after more than one effort, and on account of which defendant's father, he said, had tried to kill him. Dr. May, of Franklin county, Missouri, interviewed defendant several times after the killing of Kopf, and testified that he could not elicit rational talk from defendant. Dr. May gave it as his opinion, from what he had observed of defendant, and from the deposition read in the case, that defendant was insane. Dr. Stierberger, county physician of Franklin county, attended upon defendant after the day of the tragedy and treated his wounds. He was of the opinion that defendant was suffering from delusional insanity, unsystematized, and that his delusion was persecution. In September, 1906, a roomer at his mother's house got out a warrant for his arrest for throwing the roomers's books out of his room and cutting a magazine. Defendant heard of the warrant, and upon sight of the approach of some men, whom he imagined to be officers, he left the house by the back way, and never returned. His mother, however, received two ugly, but intelligent, letters from him, which were read in evidence, and through friends learned of his being in Kentucky and other parts.

For the State in rebuttal, two convicts, who had been held in jail several months with defendant, testified that he appeared and acted and talked like ordinary men among prisoners in the jail at all times,

except when officers or physicians were present, when he changed his conduct. They said, however, that he had frequently talked to Satan and Anti-Christ, and to his "trance," as though such personages were present.

The indictment is well enough, though the word "with" should have been omitted, where it appears after the words "did make an assault and with a dangerous weapon . . . did make an assault," etc. We have heretofore ruled, however, that its use did not render the indictment bad.

It is wholly unnecessary to reproduce the instructions as to the constituents of murder in the first and second degrees and on the plea of insanity as they are such as have repeatedly received the approval of this court.

The grounds urged for a reversal of the judgment and sentence of the court will be considered in the order of defendant's brief and argument.

I. It is insisted that the verdict of the jury is so palpably against the evidence that it should be set aside by this court. This contention is predicated first upon the circumstances attending the homicide. That the defendant shot and killed the officer without any provocation whatever must be conceded. But to say that every wanton and unjustifiable killing indicates or so establishes insanity is utterly untenable. The defendant at the time of the killing was a tramp. That he killed the officer because he thought the officer intended to arrest him is fairly deducible from the evidence for the State. That his act was wholly unjustifiable would not of itself justify this court in setting aside the verdict, for experience teaches us that many other men have likewise assumed to themselves the right to kill officers of the law upon no greater provocation, when there was not a semblance of their being insane, but their acts in so doing are attributa-

ble to their utter disregard of the law and a contempt
of social duty. Neither do we think the subsequent
conduct of the defendant in refusing to be arrested
and his attempt to kill Dr. McNay establish conclusive-
ly that he was insane. He said he did it because he
thought the doctor would get him. The testimony of
Dr. Booth indicates that immediately after he was
wounded by Dr. McNay, the defendant was rational.
He gave as his reason for shooting the officer that
he had to do it, in other words that it was in self-
defense. His other answers to Dr. Placher were re-
sponsive to the questions. To Mr. Souders he said
he shot the marshal because he thought "he was going
to club him." He gave a perfectly rational account
of the encounter with the marshal, which was corrobo-
rated by the other eye-witnesses. When the State
closed its testimony it had established the killing, by
defendant, of the officer with a deadly weapon, without
any provocation which the law recognizes and up to
that time there was nothing to establish that the homi-
cide was an insane act. Keeping in view this evidence
and the presumptions flowing therefrom, we think there
can be no doubt that if nothing further had been de-
veloped, there was but one rational or legal conclusion
to be drawn from the evidence, and that was that the
defendant was guilty of murder in the first degree.
We are unable to agree with the contention of the de-
fendant that the State's own evidence established de-
fendant's insanity so clearly that the court should have
taken the case from the jury and directed an acquittal.

We are thus brought to the next insistence, to-
wit, that the testimony on the part of the defendant
was so overwhelming that the defendant was perma-
nently afflicted with delusional insanity and that this
had existed from his childhood, that the verdict should
be set aside. In the consideration of this question,
certain principles must be regarded as established in
this State, and they are that the law presumes every

person who has reached the years of discretion to be of sound mind and capable of committing crime, and that such a person charged with the commission of a crime before he can escape the penalty affixed thereto under the plea of insanity must rebut such presumption by evidence which reasonably satisfies the jury that he was insane at the time he committed the act, or that his mind was so diseased as to render him incapable of distinguishing between right and wrong in respect to the act for which he is sought to be made criminally responsible; that the question of insanity is one of fact to be determined by the jury, and that when the unlawful killing is proved by the State or admitted by the accused the State may rest upon the legal presumption of the sanity of the accused until he shows to the contrary; that the burden of proving insanity rests upon the party setting it up and that to discharge himself of this burden it is not necessary to introduce evidence which establishes beyond a reasonable doubt his insanity, but only sufficient to reasonably satisfy the jury that it existed at the time the offense was committed; that if the preponderance of the evidence offered establishes insanity, it is sufficient. [Baldwin v. State, 12 Mo. 223; State v. Huting, 21 Mo. 464; State v. McCoy, 34 Mo. 531; State v. Redemeier, 71 Mo. l. c. 176, and cases there cited.]

The circuit court in this case instructed the jury in accordance with the foregoing principles. And conceding, as we freely do, that the defendant offered much evidence tending to show that he was insane and had been for many years, it must still remain a question of fact for the jury to determine under the instructions of the court. Learned counsel for the defendant concedes that the instructions numbered 6, 7, 8 and 9 announce in the abstract correct principles of

216 Sup—35

the law applicable to insanity as a defense to a charge of crime, but insists that they were improper and erroneous in this case in that they were not framed with reference to the permanent or probable insanity which the evidence tended to establish. And it insisted that under the evidence in the case the instructions improperly cast upon the defendant the burden of proving his insanity at the time of the homicide charged when he was entitled to the presumption that he was insane at the time of the homicidal act, if the jury believed that he was insane before the time he left his home in Washington City in 1906. No instruction incorporating this principle of law was asked by the defendant, and when the court requested counsel to suggest any proposition of law arising upon the facts, upon which the court had failed to instruct the jury, no request was made for such an instruction. We are cited by learned counsel in support of his contention to the case of State v. Lowe, 93 Mo. l. c. 570, 571. In that case, however, it will be noted that the defendant's counsel expressly invoked the principle of law for which the defendant in this case now contends, and it was held error to refuse it.

A similar statement of the law is made in State v. Wade, 161 Mo. l. c. 444, but the absence of an instruction to that effect is not made the ground for the reversing of the judgment. Inasmuch as the circuit court instructed the jury fully upon the law of insanity as a defense to a criminal prosecution, and as to total alienation as well as partial insanity, and particularly directed the jury that on the question of the sanity or insanity of the defendant they should consider all of the evidence in the case, the homicide itself, and the attending circumstances, the life, habits and conduct of the defendant as well as his mental capacity or perverseness if any, from his birth up to the time of the trial, and also the habits, mental condition and conduct of his parents, to determine whether

he was of unsound mind at the time of the commission of the crime charged, it cannot be said that the court did not charge the jury upon the law arising upon the facts developed in the case, and when the court requested counsel for the defendant to call its attention or to ask other instructions which counsel thought should be given in the case, the counsel expressly limited his request for such additional instructions to the questions of good character and the right of the defendant to testify or not to testify in the case and as to manslaughter.    To hold now that the judgment should be reversed and the cause remanded because the court did not direct the jury to find that the defendant was permanently insane before and at the time he left his home in Washington City in 1906, and then tells them that if he was so insane, it devolved upon the State to show that he committed the offense during a lucid interval would be, we think, contrary to the whole course of practice in this State.    The issue tendered by the indictment and the plea was as to whether the defendant was insane at the time he committed the homicidal act, and the court's instructions admittedly cover the law on that subject, and the court cannot be convicted of error because counsel for defendant might have invoked a presumption, which he did not even when requested by the court to do so. In our opinion the court committed no reversible error in failing to instruct on the lucid-interval theory in this case, in the absence of any suggestion that it was applicable to the facts and in the absence of any request whatever for such an instruction, in view of the very full and ample instructions on the subject of insanity given by the court of its own motion.    Section 2627, Revised Statutes 1899, has often been construed by this court, and since the decision of State v. Cantlin, 118 Mo. 100, down to and including State v. McCarver, 194 Mo. l. c. 742, this court has uniformly held that when the instructions of the court are read to the jury

or counsel have been fully advised as to what they will be and the defendant desires further instructions, it is his duty in fairness to the court, to call its attention to any matter of law arising in the case upon which the court has failed to instruct, and which it is deemed necessary by defendant to be placed before the jury in order that they may arrive at a just verdict and in the event of the failure of the court to so instruct, it is the duty of the defendant to except at the time. [State v. Bond, 191 Mo. 555; State v. Barnett and Baker, 203 Mo. l. c. 659; State v. West, 202 Mo. 128.]

II. The fact that the court instructed upon murder in the second degree can avail the defendant nothing as the jury found him guilty of murder in the first degree. The instruction for the lower grade was more favorable to him than the evidence justified.

Neither did the court err in refusing an instruction on manslaughter as there was not a scintilla of evidence tending to show any lawful or reasonable provocation for the homicidal act. The evidence in this case was either murder in the first degree or no crime at all by reason of the insanity of the defendant. So that the case at last is reduced to the question of whether the testimony as to the insanity of the defendant was so overwhelming and conclusive that the verdict of the jury appears to be the result of passion or prejudice and should be set aside by this court on that ground. As we have already said, it is a settled law of this State that whether the defendant was insane, and therefore not criminally responsible for his unprovoked act in shooting and killing the officer, was a question of fact for the jury who tried the case. That there was much evidence in the form of depositions taken in Washington City, tending to show that the defendant was afflicted with delusional insanity before he ran away from his home in Washington

State v. Barker.

City, there can be no doubt. But on the other hand, that same evidence, to a large degree, tended to show that he was simply an incorrigible and hard to control, and that for his misconduct he was criminally prosecuted and sent to a reformatory school in Washington City, from which he escaped when he started on his career as a tramp. His letters to his mother incorporated in the depositions, do not of themselves indicate insanity, but rather that he was incorrigible and that he had fled from home to avoid imprisonment in the reformatory. He had been committed to the reform school, according to the testimony of the superintendent of the reform school, charged with incorrigibility. All this testimony was before the jury, but along with it the jury were entitled to consider the presumption of his sanity and the testimony of Dr. Booth and Dr. Placher, and other witnesses who were incarcerated in the jail with him pending his trial, and it was for the jury to weigh all this evidence and determine whether or not he was sane or had the mental capacity to distinguish between the right and the wrong of his act in shooting the officer, and we are unable to say that their finding was so contrary to the testimony in the case that it evinces passion or prejudice. This court has on many occasions with evidence fully as cogent as to the insanity of the defendant refused to interfere with the verdict of the jury where the instructions were correct and fair to the defendant, and we must decline to interfere with the verdict in this case on that ground.

The judgment must be and is affirmed. All of this division concur.