# THE STATE v. JOE PRINCE, Appellant.

## Division Two, May 26, 1914.

1. **EVIDENCE: Cross-Examination: Proving Statements Contradictory of Answers: Made Out of Defendant's Presence.** When the cross-examination is about a matter which the party conducting it has a right to prove as a part of his cause of action or defense, the answers thereby elicited are material, and may be impeached or discredited by showing that the witness had made statements which conflict with his answers as given in his cross-examination; and the fact that the conflicting statements amount to an accusation of defendant, who was not present when they were made, does not alter the rule. A witness for defendant, who had very recently associated with defendant and notified him of an alleged threat against him made by deceased, on cross-examination was asked if, prior to the killing, he had heard defendant say anything about shooting deceased, or if he had any knowledge that defendant intended to shoot deceased, which questions he answered in the negative. Thereupon he was asked if he did not visit the home of deceased the evening he was killed, and there, in the presence of two others, state it was too bad that deceased was shot, and that he and defendant's father had tried hard all evening to keep defendant from killing deceased, but could not keep it down. *Held*, that the subject of the inquiry was material, and the questions proper, and were not rendered improper on the ground that defendant was not present when the witness made the statements.

2. **REMARKS OF COUNSEL: Reference to Other Murders.** Where counsel for the State in a murder trial, stated, in his argument to the jury, that "this county has been stained by the blood of forty-three murders," and upon objection the court said, "That is improper argument and should not be made to the jury; we are now trying this one case," and no request was made for a more pointed reprimand and the remark was not repeated, the remark, though improper, was not sufficiently prejudicial to warrant a reversal, since what the court said was sufficient to cause the jury to confine their consideration to the one case then on trial.

3. **JURY: Separation.** The taking, by the officer having the jury in charge, of certain jurors from the room where they had been locked up, down stairs to a toilet room to answer a call of nature, and then promptly returning them to the jury

room. was not such a separation of the jury as constitutes reversible error.

4. **MURDER: Instruction for Manslaughter in Third Degree.** Where there is no evidence tending to prove the killing was involuntary, an instruction on the law of manslaughter in the third degree is properly refused.

5. **BILL OF EXCEPTIONS: Filed in Vacation: No Order to Make Part of Record.** Since the amendment of 1911 to Sec. 2029, R. S. 1909 (Laws 1911, p. 140), the clerk in vacation .may file a bill of exceptions without any previous order of the court, except the order of the trial judge in vacation, appended to the bill of exceptions, approving the bill and ordering it filed. It is not necessary that there be a special order of the court made in term time ordering the bill filed and made a part of the record.

Appeal from Laclede Circuit Court.—*Hon. L. B. Woodside,* Judge.

AFFIRMED.

*Don O. Vernon, J. T. Moore* and *I. W. Mayfield & Son* for appellant.

(1) The statements attributed to the witness, Parrick, were at most only the opinion of the witness, without any acts, statements, or declarations made by the defendant—a conversation in which he is not present and takes no part and could not possibly have heard the accusations—and the question being repeated three times in the presence of the jury, was extremely damaging and prejudicial, besides it was wholly incompetent and only calculated to damage the defendant, and was not admissible for the purpose of impeachment. State v. Taylor, 134 Mo. 154; McFadin v. Catron, 120 Mo. 263; Schloemer v. Transfer Co., 204 Mo. 116; Hamburger v. Rinkel, 164 Mo. 407; State v. Murphy, 201 Mo. 691; State v. Hyde, 136 S. W. (Mo.) 332. (2) The court erred in not giving the instruction offered by the defense for a lower degree of murder. The evidence conclusively shows that the defendant

did not enter into the difficulty with a design to take the life of deceased. All his acts and statements, as testified to by the State's witnesses, show that he intended to fight Jordon fair, and that he, if anything, intended only a common battery. If this is true, it was error on the part of the court to not give the instruction for manslaughter in the third degree. State v. Eastman, 240 Mo. 241; State v. Turner, 152 S. W. (Mo.) 313; State v. Robertson, 160 S. W. (Ark.) 214. (3) The court erred in not giving the defendant a new trial by reason of the argument of L. C. Mayfield, which was the closing argument on the part of the State. This argument was entirely out of the record and was highly inflammatory and prejudicial to the defendant. The extreme verdict, under the evidence and on a boy of the age of the defendant, shows passion and prejudice. This language was equivalent to saying, ''There have been forty-three murders committed in Laclede county, and it is now time to stop it and that there should be a conviction in this case and an example made of this defendant.'' By the remarks of the attorney the die was cast, the poison was there, and an apology, if one was given, could not stop the force of the statement. The evidence offered on motion for new trial shows that no apology was made. The court does not say that an apology was made. State v. Wellman, 161 S. W. (Mo.) 795; State v. Ferrill, 136 S. W. (Mo.) 709; State v. Dietz, 138 S. W. (Mo.) 532; State v. Spivey, 191 Mo. 112. (4) The court erred in not granting the defendant a new trial by reason of the separation of the jury after they had received the instructions and while deliberating on the verdict. Secs. 5232, 5233, R. S. 1909; State v. Gray, 100 Mo. 523; State v. Murray, 91 Mo. 95; State v. Jeffries, 210 Mo. 332; State v. Witten, 100 Mo. 531.

*John T. Barker*, Attorney-General, for the State; *Sutton & Huston* of counsel.

(1) It is a serious question whether the bill of exceptions has been properly made a part of the record in this cause. It is well established that the record proper must show the filing of the bill, but the decisions indicate that the record proper must also show that the bill was by the court allowed and ordered filed and made a part of the record in the cause. Alt v. Dines, 227 Mo. 422; Sheppard v. Wagner, 240 Mo. 431; Bank v. Hutton, 224 Mo. 52; Novinger v. Railroad, 131 Mo. App. 338; Webster v. Berry, 140 Mo. App. 386; Fulkerson v. Houts, 55 Mo. App. 302; Thorp v. Railroad, 157 Mo. App. 501. As we construe the authorities, there must be made and signed by the judge and entered of record an order, separate and apart from the bill of exceptions, allowing the bill and directing it to be filed and made a part of the record. (2) The evidence was elicited for the purpose of impeaching the witnesss, Parrick, and it was clearly admissible for that purpose. The witness had testified that he did not know the defendant contemplated shooting Jordan, and had not heard defendant say anything about it. The statement made by Parrick to Hough, as testified to by him, was a direct contradiction of Parrick's testimony upon a material matter in issue, and no error was committed in receiving the testimony. State v. Talbott, 73 Mo. 360; State v. Taylor, 136 Mo. 72. (3) Instruction number 1 requested by defendant and refused by the court, upon manslaughter in the third degree, was properly refused. It has been repeatedly held that there can be no manslaughter in the third degree where the killing is wilful and intentional. State v. Watson, 95 Mo. 415; State v. Edwards, 70 Mo. 480; State v. Curtis, 70 Mo. 600; State v. Dunn, 80 Mo. 689; State v. Goldsby, 215 Mo. 54; Sec. 4462, R. S. 1909. All of the evidence in the case tends to

show that the killing was intentional. Moreover, if one inflict a mortal wound, with a deadly weapon, upon a vital part, as in this case, he must be presumed to have designed the natural consequences of his act. State v. Dunn, 80 Mo. 689. (4) Defendant complains of the following language used by counsel representing the State: "The history of Laclede county has been stained by the blood of forty-three murders." The court immediately admonished counsel, and counsel immediately withdrew the statement and apologized to the court for having made the remark. Considering the corrective action of the court and counsel, the language cannot be regarded as prejudicial to the substantial rights of defendant. State v. Dipley, 242 Mo. 480; State v. Fenton, 248 Mo. 491; State v. Miles, 199 Mo. 553. There was, however, no exception taken by defendant to the ruling of the court, and no request was made for a rebuke from the court to counsel. The only exception taken was directly to the remark of counsel and not to the ruling of the court, but this cannot avail. State v. Wana, 245 Mo. 562. (5) There was no separation of the jury within the meaning of the statute: Secs. 5232, 5233, 5284, R. S. 1909; State v. Washburn, 91 Mo. 574; State v. Gregory, 158 Mo. 148; State v. Shipley, 171 Mo. 549; State v. Dyer, 139 Mo. 211; State v. Payton, 90 Mo. 228; State v. Spaugh, 200 Mo. 608.

BROWN, J.—From a conviction of the crime of murder in the first degree and the imposition of a life sentence, defendant appeals.

The information charges defendant, Joe Prince, as principal, and Arthur Prince and William Prince as accessories before the fact, with the murder of one Charles Jordan in Laclede county on May 31, 1913. A severance was granted and defendant was tried separately.

Alleged errors urged here for reversal are: (1) admission of incompetent evidence; (2) improper argument; (3) separation of the jury after the cause was submitted to them; and (4) the refusal of an instruction on manslaughter in the third degree.

The family of defendant consisted of his father, Arthur Prince, and several brothers who resided on a farm near the village of Pease in Laclede county. The deceased resided on an adjoining farm about seventy-five yards distant from defendant. There is a lane leading from the village of Pease to the farms occupied by defendant and deceased, which lane they used in common for a distance of about one hundred and fifty yards, where a gate opened into the field of deceased. The lane extended beyond said gate to the home of defendant.

There is only slight evidence of ill-will between defendant and deceased prior to the evening of May 30, 1913, at which time they engaged in a quarrel about a hog belonging to defendant which had gotten into the field of deceased. According to the State's witnesses defendant cursed and threatened to kill deceased on that occasion; while according to defendant's witnesses, deceased, during that quarrel, called defendant vile names and threatened to kill him. The wife of deceased testified that the quarrel and the accompanying threats made by defendant so alarmed her that she carried a shotgun to deceased to enable him to protect himself. However, neither the gun nor any other weapon was then used, and the quarrel ended without any physical violence to either party.

On the following morning deceased attended a sale several miles from home, going and returning on horseback through the lane hereinbefore mentioned. About one o'clock that day the defendant, with his father, one of his brothers and two of his brothers-in-law, Tom Parrick and Walter Green, went to Pease on foot and remained there until about five p. m. At that

hour deceased rode into the village and stopped a few moments to get his mail. At or about the same time the deceased arrived at Pease, the defendant, his father and two brothers-in-law, started home along the lane before mentioned. The brothers-in-law, Parrick and Green, had passed the gate which connected the premises of deceased with the lane, a distance variously estimated at from ten to thirty steps, while defendant and his father were opposite said gate when the deceased overtook them. Deceased dismounted and was shot and killed by defendant with a revolver. There is a sharp conflict in the evidence as to who was the aggressor, the testimony of the State tending to show that deceased merely alighted from his horse to open the gate and did not wish any trouble with defendant; while the evidence on behalf of defendant is to the effect that deceased was advancing upon and threatening defendant with an open knife when killed.

Five witnesses for the State testified that they watched defendant, his father and brothers-in-law as they started home; that they stopped until deceased started to ride into the lane; that they then went on to the gate, which opened into the premises of deceased, where defendant and his father stopped again and remained until deceased arrived, alighted from his horse and walked up to the gate, when defendant, who was standing about eight feet away, shot deceased twice with a revolver without any provocation, so far as they could observe. The witnesses last named testified that they were about one hundred and fifty yards distant, and that the lane was straight and the view unobstructed, so that they could see the shooting plainly. The father of defendant was standing some six feet away when the shooting occurred.

The only witness introduced by the State who was close enough to hear the words which passed between defendant and deceased immediately preceding the kill-

258 Mo.—21

ing was Walter Green, one of the brothers-in-law of defendant, who states that when deceased came in sight of the village of Pease defendant and his father went up the lane about half way to the gate of deceased and stopped. Green gave the following additional evidence:

"Q. Then what did they do? A. Well, they just stopped there.

"Q. Did you go up the road? A. Yes, sir.

"Q. Did you overtake them? A. Yes, sir.

"Q. Well, now just state to the jury what you heard, if anything, and the movements of these parties? A. Well, they was standing around there talking to one another a right smart that evening, and when they saw Charley coming Arthur motioned— . . . Arthur motioned for the boys to come on he said, 'Come on and let's go.'

"Q. Who do you mean by the boys? A. I guess he meant Joe.

"Q. Who did you mean? A. Arthur and Bud and Joe.

"Q. Did he motion to the defendant here? A. Joe was standing with him, and he motioned, I guess for Bud, and he said, 'Come on boys, let's go.'

"Q. Go ahead and state. A. They went on about half way between the mill and the corner of the fence and stopped and waited until Charley went into the store and got his mail and come out and rode into the lane before they started on.

"Q. Then where did they go? A. They went on up to the corner, I suppose.

"This last statement was objected to by the defendant; which objection was, by the court, sustained.

"Q. You was there and saw them, didn't you? A. Yes, sir.

"Q. Where did they go? A. Up the road.

"Q. Where abouts? A. At the gate.

"Q. What did they do? A. I wouldn't say whether they stopped or not, because I was walking on ahead.

"Q. How far was you ahead of them? A. Well, I was about—when they got to the corner?

"Q. Yes? A. About like thirty yards, I guess.

"Q. Who was with you? A. Tom Parrick.

"Q. Did you stop? A. Yes, sir, I stopped when Charley rode up.

"Q. Now state to the jury what was done and said there? A. Well, Joe just kinder stepped out towards Charley and said, 'Charley, I guess we had better settle our little trouble we had yesterday evening,' and Charley said, 'Don't you guess you had better go on and let me alone?' and Joe says, 'I don't know,' and Charley says, 'I think so,' and Charley got down on the opposite side of his horse, next to the gate with his knife in his hand and got around about the horse's head and Joe shot him.

"Q. Well, how were they standing, how was Charley standing with reference to facing Joe? A. He was standing with his left shoulder to him, with the side of his head.

"Q. What position was he in? A. Well, he was standing with his left shoulder to him, kinder looking down, I think.

"Q. Looking down at what part of the gate? A. He was looking down; just looking down.

"Q. Did that end of the gate open or was it the other end of the gate that opened? A. The end where he was at opened. . . .

"Q. How close was Joe Prince to Charley Jordan when he fired? A. He was about four or five feet.

"Q. How close was Arthur Prince to Joe Prince? A. About six feet of him. . . .

"Q. Now, Mr. Green, where did you pass Joe Prince and Arthur Prince? A. About half way between the mill and the corner at the gate.

"Q. Did you hear any conversation between Arthur Prince and Joe Prince, his son? A. No, sir; not particular.

"Q. Well, did you hear anything? A. I heard Arthur say to Joe to let him have the gun, is about all. . . .

"Q. Arthur said to Joe, 'Give me the gun,' did he? A. Yes, sir.

"Q. How far was you from them when you heard that? A. I just walked up to them."

Thomas Parrick, the other brother-in-law of defendant, testifying on behalf of defendant, said that he (witness) was at the home of deceased the night before the tragedy, and that deceased told him if they ever had any more trouble he would kill defendant, and that he (witness) communicated that threat to defendant.

Regarding what occurred at the time the killing took place Parrick testified as follows:

"Q. Now were you down at Pease Mill the day the shooting occurred? A. Yes, sir; I was down to Pease Mill.

"Q. Now just tell the jury what occurred down there? A. Well, we had started home and Charley overtook us at the corner where we go up to the Prince house, and he said, 'Here is where I have got you, Joe.'

"Q. Who said that? A. Charley Jordan, and he got off his mare on the opposite side and come around under the mare's neck with his knife in his hand, and he had his knife up at Joe and Joe shot him; he shot two shots, right straight along and Charley reeled back the first shot.

"Q. I will ask you to state how far he got, Charley Jordan got before he was shot? A. From Joe he was about three or four feet. . . .

Q. You all walked together until you got up by the gate? A. Yes, sir.

State v. Prince.

"Q. I will ask you to state if you stopped and waited for Charley Jordan there? A. No, sir; we didn't stop at all, Charley Jordan rode up.

"Q. Did you hear Joe say anything there when the shooting occurred, or just before it? A. No, sir; I didn't.

"Q. Now, I will ask you to state what was said that called your attention to the fact that he had ridden up there? A. Well, he says, 'Here is where I have got you,' to Joe, and I looked around and Mr. Jordan was getting off his horse.

"Q. Well, I will have you to state about what is your distance from Joe and Charley Jordan at the time you looked around? A. Well, I was about ten or fifteen steps on up the road.

"Q. Up the lane? A. Yes, sir.

"Q. Was Mr. Green with you at the time; you say that Mr. Green and Joe Prince walked up to the gate, did you? A. Yes, sir.

"Q. Now explain to the jury how Mr. Green was ten or fifteen steps south of the gate, if Joe didn't stop at the gate? (No answer.)"

The evidence of all the witnesses was to the effect that defendant's open pocket-knife was seen lying at his feet after he was shot.

The State to establish malice and deliberation on the part of defendant introduced witnesses Elmer Hough and Earl Simpson, who visited the Prince home the night before the tragedy. Those witnesses testified that during their visit defendant expressed intense anger because deceased had cursed him and called him a vile name the evening before; that defendant said he would "get Jordan (deceased) if he (defendant) had to go under the bed after him;" that he was willing to fight fair, but would not let deceased use a knife on him.

Everett Calton testified to having seen defendant at Pease the afternoon of the tragedy, and that the

defendant inquired if he had seen deceased. On being informed that witness had not, defendant stated that he wanted to see deceased about the quarrel they had had the evening before, and further stated that he (defendant) came down there to catch deceased off of his own premises. That he intended to ask deceased to fight fair, and if deceased would not do so he (defendant) would use his gun, showing witness his revolver at the time.

## OPINION.

I. After defendant's witness Parrick had given his evidence, as before recited, he was asked on cross-examination if, prior to the killing, he had heard defendant say anything about shooting deceased, or if he had any knowledge that defendant intended to shoot deceased, which questions he answered in the negative. Parrick was then asked if he did not visit the home of Charley Jordan, the deceased, the evening he was killed, and there, in the presence of Burrell Hough and Pete Everett, state that "it was too bad that Charley was shot; that witness and Arthur Prince had tried hard all evening to keep Joe from killing Charley, but could not keep it down." This question was objected to on the ground that defendant was not present and could not be bound by the alleged statement made by witness Parrick; and on the further ground that it was an attempt to impeach the witness on an immaterial matter. These objections were overruled, and defendant excepted. Defendant then replied to the question as follows: "If I said it, I did not say it that way."

*Impeaching Witness.*

Witnesses Hough and Everett were then called, and, over defendant's objections and exceptions, testified that witness Parrick did make the statement attributed to him in the interrogatory above quoted.

The admission of this evidence is assigned as error prejudicial to defendant. We find, however, that this evidence was not improper. The witness Parrick had very recently associated with defendant, and had notified defendant of the alleged threat made against him by deceased; and if defendant had also made any threats against deceased or preparation to shoot him the witness would have been as likely to know of that fact as anyone else; and when he stated that he did not know of any intention on the part of defendant to shoot deceased that evidence was very material. The rule is that when the cross-examination is about a matter which the party conducting the examination has a right to prove as a part of his cause of action or defense, then the answers elicited by such cross-examination are material, and may be impeached or discredited by showing that the witness has made statements which conflict with his answers as given in his cross-examination. The fact that the conflicting statements amount to an accusation against defendant, who was not present when they were made, does not alter the situation. [Paris v. Waddell, 139 Mo. App. 288, l. c. 291.] In Underhill on Criminal Evidence (2 Ed.), sec. 222, the rule is announced as follows:

"It is never permissible to cross-examine upon matters wholly irrelevant and collateral to the crime merely for the purpose of contradicting the witness on those points by other evidence. And if the cross-examiner shall happen to bring out irrelevant facts he is concluded thereby, and cannot contradict them. It is proper, however, to ask the witness if he did not at a particular time and place, which must be mentioned, give a different account of relevant facts to that which he gave on his direct examination. If he denies that he has done so, a sufficient foundation is laid for his impeachment, which may then be accomplished by the testimony of a witness who was present and heard the contradictory statement."

The conclusion we have reached on this point is also supported by the rulings of this court in State v. Cooper, 83 Mo. 1. c. 701-2; State v. Mulhall, 199 Mo. 202, 1. c. 212; and 1 Greenleaf on Evidence (16 Ed.), p. 590. Defendant's first assignment will therefore be overruled.

II. It is insisted that reversible error was committed by L. C. Mayfield, special counsel for the State, in saying to the jury in his closing argument that "the history of Laclede county has been stained by the blood of forty-three murders." Upon objection the trial court admonished the attorney as follows: "That is improper argument and should not be made to the jury. We are now trying this one case." Defendant excepted to the remarks of the special counsel, but did not ask for a more pointed reprimand. While the remarks were improper, we do not think they were sufficiently prejudicial to defendant to warrant a reversal. No request was made for a more pointed reprimand, and, upon a careful review of the whole case, we find that what the court said was sufficient to cause the jury to confine their consideration to the one case then on trial. If the improper argument had been repeated, as it was in many cases that have come before us, or if the improper argument had been sanctioned by the trial court, the result might be different. [State v. Ferrell, 233 Mo. 452; State v. Hess, 240 Mo. 147, 1. c. 159-60.]

**Argument.**

III. Regarding the alleged misconduct of the sheriff in permitting the jury to separate, we will say that the separation is shown by affidavits, which prove that certain of the jurors were taken by the officer having them in charge from the room where they had been locked up to a toilet-room down stairs to answer a call of nature, and then promptly returned to their room. Such a

**Separation of Jury.**

separation does not constitute reversible error. [State v. Spaugh, 200 Mo. l. c. 608, and cases there cited.].

IV. Defendant also complains of the refusal of the court to instruct the jury on the law of manslaughter in the third degree. The Missouri cases cited by defendant (State v. Eastham, 240 Mo. 241, and State v. Turner, 246 Mo. 598) are not in point, because what was said in those cases related to manslaughter in the fourth degree.

**Manslaughter Third Degree.**

There is no part of the evidence which tends to prove that the killing was involuntary. Therefore the instruction for manslaughter in the third degree was properly refused. [State v. Watson, 95 Mo. 411; State v. Goldsby, 215 Mo. l. c. 54; Sec. 4462, R. S. 1909.]

V. The Attorney-General insists that we ought not to consider the alleged errors noted in defendant's bill of exceptions, because the transcript of the record proper does not show that the trial court ordered the bill of exceptions filed and made a part of the record proper. In support of this insistence the following cases are cited: Alt v. Dines, 227 Mo. l. c. 422; Sheppard v. Wagner, 240 Mo. l c. 431-432; Bank v. Hutton, 224 Mo. l. c. 52; Novinger v. Railroad, 131 Mo. App. l. c. 338; Webster v. Berry, 140 Mo. App. l. c. 386; Fulkerson v. Houts, 55 Mo. 301; and Thorp v. Railroad, 157 Mo. App. l. c. 501.

**Exceptions.**

The only entry in the record proper showing that the bill of exceptions was filed is as follows:

"On December 8, 1913, in vacation, the defendant filed his bill of exceptions."

The certificate of the trial judge appended to the bill of exceptions (a copy of which we find in the transcript) recites that he approved said bill and ordered it filed and made a part of the record in the cause. The mere act of the clerk in filing the bill pursuant

to the order of the judge (as recited in his certificate), together with the notation by the clerk on the record proper of the fact that the bill was filed, and the date of such filing, is all that is necessary to make the bill part of the record. There was no judicial duty resting upon the clerk to declare and adjudge the bill to be a part of the record proper.

Under section 2029, Revised Statutes 1909, as amended by Laws 1911, p. 139, a trial judge may now approve, sign and order a bill of exceptions filed after the expiration of the time granted for filing same, and the clerk may file such bill in vacation without any previous order of the court, except the order of the judge in vacation embraced in his certificate showing that the bill has been approved and signed by him.

Since the amendment of 1911, above noted, the cases cited by the Attorney-General are no longer authority, and his contention must be disregarded.

Finding no error in the record by which the rights of defendant were prejudiced, the judgment will be affirmed. It is so ordered.

*Walker, P. J.,* and *Faris, J.,* concur.