THE STATE v. HUGH Y. TARWATER, Appellant.

Division Two, March 20, 1922.

1. **Insanity: Evidence: Records of Asylum.** On the trial of defendant for murder in the first degree, where the defenses were self-defense and insanity, the records of an insane asylum, with reference to the confinement of defendant's father and of defendant himself, were not competent evidence, inasmuch as it did not appear that they were authorized or required either by express statute or by the nature of the duties of those in charge thereof, nor did it appear that the records offered were the "detailed account" required by Section 12283, Revised Statutes 1919, or a copy or record thereof.

2. ———: ———: **Newspaper Articles.** On the trial of defendant for murder in the first degree for killing the editor of a newspaper, where the defenses were self-defense and insanity, articles and parts of articles, appearing in such newspaper, which did not refer to defendant, were not competent evidence to show their effect on the mind of defendant as bearing on his plea of insanity and were properly excluded.

3. ———: ———: **Letter of Deceased to Attorney.** On the trial of defendant for murder in the first degree for killing the editor of a newspaper, against whom and his partner defendant had a libel suit pending, there is nothing before the Supreme Court for review, where defendant offered in evidence a letter from the deceased editor's partner to his attorney in the libel suit and relating thereto and referring to defendant, and upon such offer

293 Mo. Sup.—18

the trial court indicated that he would not exclude the whole letter but merely the privileged portions thereof, and defendant's counsel acquiesced in such ruling by agreeing to mark such portions as he desired to use and made no further offer of the letter.

4. ——: ——: **Family History: Hearsay: Conclusions.** On the trial of defendant for murder in the first degree, where one defense was a plea of insanity, there was no error in the trial court's refusing to permit a witness to testify that her mother had told her that defendant's father had been confined in an insane asylum, such evidence being merely hearsay and not a proper inquiry as to family history, particularly in view of the fact that there were living witnesses who knew and testified concerning such confinement. And mere statements of conclusions by the witnesses were also properly excluded.

5. ——: ——: **Pleadings in Libel Suit.** On the trial of defendant for murder in the first degree for killing the editor of a newspaper, where the defenses were self-defense and insanity, the petition and answer in a suit for libel, brought by defendant against such newspaper, were properly excluded, when offered by defendant, as wholly irrelevant to any issue in the case, the trial court having already admitted in evidence the alleged libelous article set out in such petition. Whatever defendant may have said in such petition could only be construed as self-serving statements, and it, moreover, appeared from the testimony of his lawyer in that suit that defendant was not only normal during the time in question but that he read understandingly and eagerly all the cases in Missouri on the subject of libel.

6. ——: ——: **Cumulative: Malicious Prosecution Suit.** Where the records of a malicious prosecution suit brought by defendant, who was on trial for murder in the first degree and was defending on a plea of self-defense and insanity, were offered by defendant in evidence, the trial court did not err in excluding them, as the other testimony fully informed the jury about such suit and its termination, and the records were therefore merely cumulative evidence.

7. ——: ——: **Rebuttal: Threats of Defendant.** On the trial of defendant for murder in the first degree for a homicide in 1919, where the defenses were self-defense and insanity and there was testimony for defendant that in 1896 he had been twice confined in an insane asylum, it was competent for the State to show in rebuttal that in 1895, when defendant was charged with and acquitted of obtaining goods by false pretenses from a certain firm and began a suit against such firm for malicious prosecution, he had at that time made threats against the lives of the judge before

State v. Tarwater.

whom he was tried and of the prosecuting attorney and that he said that if convicted he would kill both of them and then, as a defense, enter a plea of insanity, as it was very proper that the jury should know whether or not he was feigning insanity at that time as well as at the time of the trial.

8. ———: ———: **Clothing of Deceased: Exhibiting to Jury.** There was no error in permitting the exhibition to the jury of the clothing worn by the deceased at the time of the killing, on the trial of defendant for murder in the first degree, for the purpose of showing the position of the deceased at the time defendant shot him, and, in view of the plea of self-defense such evidence was competent and highly material. And under the circumstances of this case, the appearance of such clothing on the railing, in the presence of the jury, was not a matter about which defendant could properly complain.

9. **TRIAL: Presence of Deceased's Widow and Friends: No Complaint or Exception.** Where no complaint was made at the time to the trial court, during the trial of defendant for murder in the first degree, about the presence in the court room of the widow and other relatives and friends of the deceased or about the presence of crowds of spectators at the trial and no exception was saved thereto, there is nothing in regard thereto before the Supreme Court for review on appeal from a judgment of conviction of murder in the second degree.

10. ———: **Absence of Defendant During Trial: No Exception.** Where defendant's counsel, during his trial for murder in the first degree and the *voir dire* examination of the jury and at the moment of adjournment and after the panel of jurors had been admonished by the court, stated that he wanted the record to show that defendant was removed from the court-room and taken to jail about twenty minutes ago and that he has not been in court during a part of these proceedings and that he objected to it, but no exception was saved for review, the Supreme Court cannot on appeal consider such complaint, particularly in view of the fact that the record shows the presence of defendant throughout the trial, in accordance with Section 4008, Revised Statutes 1919, and he being present at the beginning such presence is presumed to continue.

11. ———: **Separation of Jury.** Where, during the trial of defendant for murder in the first degree and before the final submission of the case to the jury and before their retirement for deliberation, ten of the jurors were taken out for exercise by an officer, leaving two of the jurors in the room with another officer, said two jurors being ill and unable to accompany the ten, and the ten jurors had not gone far when they met the trial judge who directed that they

be returned to their room and there kept together, there was no reversible error, inasmuch as it was shown affirmatively by affidavits on the part of the State that the jurors were at all times under the immediate and close supervision of sworn officers and that they were not subjected to improper influence.

12. **EXPERT WITNESS: Hypothetical Question.** The trial court committed no error where, on the trial of defendant for murder in the first degree, one of his defenses being insanity, it permitted counsel for the State to ask a hypothetical question, touching the insanity of defendant, of one of defendant's witnesses, after such witness had qualified as an expert, and upon objection made by defendant's counsel, such counsel was asked to supply such facts as he believed were in evidence and yet omitted in such question, and he did so, and it was accepted by the questioner and an answer unfavorable to defendant was given by the witness, particularly in view of the fact that further examination of such witness fully and fairly presented to the jury any weakness, according to defendant's theory, in the hypothetical question and the answer thereto.

13. **VERDICT: Passion and Prejudice: Insanity.** On his trial for murder in the first degree, where his defenses were self-defense and insanity, defendant was convicted of murder in the second degree and his punishment fixed by the verdict of the jury at imprisonment in the penitentiary for thirty-five years. On his plea of self-defense, there was ample countervailing testimony to the effect that he was the aggressor and that without provocation he fired the fatal shots into the body of the deceased, and hence there was, on that question, an issue for the jury, which they determined adversely to defendant. The trial court was most liberal in allowing him to produce testimony in support of his plea of insanity, while, for the State, there was testimony that he was sane at all times and was an efficient and capable business man, with nothing abnormal noticeable in his conduct, and even from his own witnesses it appeared that he was a normal, intelligent man at all times. The instructions given by the trial court to the jury were correct and fair and no complaint in that respect was made against them. The Supreme Court therefore declines to disturb the verdict and judgment on the ground asserted by defendant that the verdict was the result of passion and prejudice and induced by the presence of public sentiment and not warranted by the evidence, but on the contrary, finding no reversible error, affirms the judgment.

Appeal from Daviess Circuit Court.—*Hon. Arch B. Davis*, Judge.

AFFIRMED.

*John C. Leopard & Son. W. W. Davis* and *Dudley & Brandom* for appellant.

(1) The record of the admission of William A. Tarwater, the father of the defendant, in the Fulton Asylum in 1885, should have been admitted as part of the record of the mental history of the defendant and his ancestors. (2) The statute in force at that time (R. S. 1909, sec. 1415) provides for the keeping of records and that certain statements shall be kept and preserved as a part of the record of inmates of the asylum. There is every presumption of honesty, accuracy and good faith in the preservation and keeping of records of institutions of this character. 2 Wharton, Crim. Ev. 1107, sec. 528; Wharton, Ev. secs. 72-170, 172; 2 Wigmore, Ev. secs. 1420 to 1426. (3) The record of the two admissions of the defendant to the Asylum at St. Joseph in 1896, excluded by the court, should also have been admitted in evidence for similar reasons. It describes his condition while there. It showed his symptoms—the very things the jury would want to know as a test of his mental condition. 2 Wharton's Crim. Ev. 1092, sec. 526. (4) The article published and printed in the Gallatin Democrat on May 30, 1918, entitled, *"Will He Help Raise Hell?"* which the court refused to admit in evidence, was the very thing that started the trouble. It was the foundation for all the subsequent articles the publication of which caused the defendant's mind to become unbalanced, and this article, more than any other, was entitled to go to the jury for their consideration on the question of the defendant's mental condition at the time. I Wigmore, Ev. sec. 231, p. 287; p. 280, par. 4, sec. 228. In all inquiries relating to insanity every reasonable latitude should be allowed. De Jarnette v. Comm., 75 Va. 867. All previous mental and physical history of the accused is relevant, as the inference of insanity must rest upon many facts. Underhill, Crim. Ev. 199, sec. 159. Great

latitude is allowed where the defense is insanity. Evidence of anything and everything which in some substantial way would tend to show defendant's nervous organization was affected should be admitted. State v. Porter, 213 Mo. 63. (5) The letter written by witness R. J. Ball to Attorney Thomas H. Hicklin, should also have been admitted in evidence for a similar reason. (6) The numerous articles published in the Gallatin Democrat offered in evidence by the defendant and refused by the court should have been admitted in evidence. (7) The evidence of family history, family tradition, as to the insanity and mental weakness of various members of the Tarwater family offered by the defendant in the deposition of witness Sally Abbington, Ann Bishop, and excluded by the court should have been admitted. (8) The petition and answer in the libel suit wherein the defendant was plaintiff against Wes L. Robertson and Robert J. Ball, publishers of the Gallatin Democrat, was admissible, and the court erred in refusing to admit it. (9) The record of the malicious prosecution suit of Hugh Y. Tarwater, against John W. Scudder & Co., and the disposition of that case, in the Circuit Court of St. Louis County in 1895, and the record of the acquittal of the defendant in Jefferson County should have both been admitted in evidence. (10) This testimony by witness Buzard had no place in the case and should not have been admitted in the first place, and after this prejudicial evidence had gone in, the defendant was entitled to explain by showing the court records of his acquittal and of the result of the malicious prosecution suit. (11) There was misconduct on the part of the court, counsel for State and friends and relatives of the deceased during the trial. Senn v. Railroad, 108 Mo. 142; Turner v. Harr, 114 Mo. 335; Mammenberg v. St. Ry. Co., 62 Mo. App. 567; Hahn v. Hammerstein, 272 Mo. 262; 22 Cyc. 710. (12) The motion for new trial should have been sustained, not only for errors referred to, but because the verdict was manifestly the result of passion, prejudice and pressure of public sentiment and not warranted by the evidence.

*Jesse W. Barrett,* Attorney-General, and *Henry Davis,* Assistant Attorney-General, for respondent.

(1)   The so-called record of the admission of the appellant's father to an insane asylum was properly excluded.   The records were not required by law to be kept. Sec. 12283, R. S. 1919; State v. Baker, 246 Mo. 373; In re Barney, 174 N. Y. S. 242; 10 R. C. L. sec. 339. (2) Cumulative evidence on the subject of insanity is unnecessary.   State v. Baker, 246 Mo. 357.   (3) The exclusion of the record of the two admissions of appellant to an insane asylum was likewise not error.   (4) The publications in the newspaper owned by the deceased were properly excluded.   Words, however provocative, do not justify an assault.   State v. Finley, 245 Mo. 465; State v. Meyers, 221 Mo. 598; State v. Morris, 263 Mo. 348; State v. Porter, 213 Mo. 57.   (5) It was not error to exclude the letter written by witness Ball to attorney Hicklin.   Its purpose could have been only for showing a feeling by Ball against appellant and that was shown by other evidence.   (6) The evidence of family history was hearsay and properly excluded.   State v. Church, 199 Mo. 605; State v. Punshon, 124 Mo. 448; State v. Bauerle, 145 Mo. 1.   (7) It was not error to exclude the pleadings in the libel suit brought by appellant against Robertson and Ball and the pleadings in the damage suit brought by the widow of the deceased against appellant for the death of her husband.   The one could have been self-serving only and the other was as to a matter occurring after the offense for which appellant was on trial had been committed.   (8) The testimony of witness Buzzard to statements made by appellant as to claiming insanity in the event that he should commit another crime was competent and material.   State v. Bruant, 93 Mo. 299; State v. Stevens, 242 Mo. 439; Waller v. United States, 179 Fed. 810; 16 C. J. p. 555, sec. 1074.; State v. Moreaux, 254 Mo. 398.   (9) The exhibition of the clothing worn by the deceased at the time of the killing was proper for the purpose of showing the position of the deceased. State v. Wieners. 66 Mo. 29;   State v. Buchler, 103 Mo.

208; State v. Long, 209 Mo. 382. (10) In a hypothetical question, counsel has the right to assume the facts to be according to his theory of them. State v. Privitt, 175 Mo. 225; State v. Ferguson, 278 Mo. 136. (11) The position of the family and friends of the deceased at the trial is not shown in the record, no objections were made thereto and the point was not saved for review. The showing cannot be made by affidavits. State v. McAffee, 148 Mo. 370; State v. Grant, 144 Mo. 66; State v. Feeley, 194 Mo. 315. (12) The record shows that the appellant was present throughout the trial. If the record shows his presence at the beginning it is presumed to continue. Sec. 4008, R. S. 1919; State v. Temple, 194 Mo. 628; State v. Feeley, 194 Mo. 300; State v. Church, 199 Mo. 379; State v. Beedle, 180 S. W. 890. There was no exception taken to the failure of the court to make a ruling when counsel suggested that appellant had been absent. The point was not, therefore, saved for review. State v. Armstrong, 167 Mo. 257; State v. Hawkins, 210 S. W. 7. (13) The mere fact of the separation of the jury will not invalidate a verdict when it is shown that no juror was subjected to improper influence. State v. Orrick, 106 Mo. 124; State v. Spaugh, 200 Mo. 608; State v. Prince, 258 Mo. 328. The affidavits of the sheriff and his deputy and each of the jurors are sufficient to overcome the presumption that the jury was tampered with. State v. Schafer, 172 Mo. 335. It is not a separation of the jury for one of them accompanied by the officer in charge, to walk ten or twelve feet behind the file of the others. State v. Shipley, 171 Mo. 544. (14) The verdict was warranted by the evidence and is not the result of passion and prejudice.

REEVES, C.—On the 23rd day of December, 1919, appellant went to the editorial and business office of the Gallatin Democrat in Daviess County, Missouri, and there shot and fatally wounded Wesley L. Robertson, the editor. Robertson died the same day. For this appellant was charged with murder in the first degree,

Upon a trial, he was convicted of murder in the second degree and sentenced to imprisonment in the State Penitentiary for a period of thirty-five years. His plea was that of self-defense and insanity.

There was a vast accumulation of testimony on both sides of the issues joined and the sufficiency thereof to warrant a conviction was not challenged below. The assignments of error are procedural and relate chiefly to the admission and exclusion of testimony, all of which, with such statement of facts as may be pertinent, will appear in the course of the opinion.

I. The initial complaint is that the trial court erred in refusing to admit certain record and documentary evidence.

(a) On his insanity plea appellant sought to show by the records of the Insane Asylum at Fulton, Missouri, that his father, William A. Tarwater, had been confined there in the year 1885. Such records were rejected because it did not appear that they were authorized either by express statute or by the nature of the duties of those in charge thereof. Appellant relies on the provisions of Section 12283, Revised Statutes 1919, as sufficient to authorize such records to be made and kept. This statute was in force in 1885 and is as follows:

"There shall be sent with each patient a detailed account of his or her case, as far as practicable, stating the cause of his or her insanity, its duration, the former treatment of the patient, and all other particulars relating to the patient, and his or her disease; and, if possible, someone acquainted with the individual should accompany him or her to the hospital, from whom minute and essential particulars of his or her insanity may be learned."

This section requires a "detailed account . . . stating the cause of his . . . insanity, its duration," etc. This "detailed account" is not required by statute to be filed, recorded or preserved, and it did not appear from testimony *aliunde* that it was the duty of any func-

tionary or agent of the State to preserve in any form such detailed account or other particulars regarding the physical condition or treatment of the patient. Furthermore, it was not shown that the record offered in evidence was either the "detailed account" required by statute or a copy or record thereof.

The rule is that "writings, such as a public functionary is required to enter in books in the course of public duties, are public documents, and they, or exemplified copies of them, are admissible in evidence," although this rule has been challenged by some of the authorities where the duty is imposed by a city ordinance as a mere police regulation. [Conner v. Insurance Co., 78 Mo. App. 131.]

The present rule, however, is as first stated. [State v. Austin, 113 Mo. 538; Levels v. Railroad, 196 Mo. 606; Priddy v. Boice, 201 Mo. 309; State ex inf. v. Heffernan, 243 Mo. 442; Delmar Inv. Co. v. Lewis, 271 Mo. 317; Simpson v. Wells, 292 Mo. 301; 22 C. J. p. 791; 10 Ruling Case Law, sec. 303, p. 1100; 3 Wigmore on Evidence, sec. 1630; Ohmeyer v. Supreme Forest Woodmen Circle, 91 Mo. App. 189.]

It will be observed from the above authorities that the documents eligible for use as testimony, were such documents and records as were required by law to be kept, and in nearly all the cases were declared by statute to be prima-facie evidence. Such is not the case here.

In the case of Priddy v. Boice, supra, l. c. 334, GRAVES, J., made an exhaustive review of all of the authorities touching the question before us. The question there was the admissibility of properly certified copies of United States Census reports. The learned author of that opinion said: "These are public official records, required by law to be made and kept, by sworn public officials of the law, and by law required to contain the name, age, sex, color, occupation, etc., of each inhabitant."

The case of Flora v. Anderson, 75 Fed. l. c. 231, was cited with approval in the Priddy Case. It, too, had the

question of the admissibility of United States Census reports and the following apt excerpt is taken therefrom: "That such documents, being official registers, are admissible in evidence in so far as they contain statements as to matters which the law requires should be inquired into, reported upon, and then recorded."

The records under review do not come within the rule which admits in evidence: "Official registers of records kept by persons in public office in which they are required, either by statute or by the nature of their office, to write down particular transactions occurring in the course of their public duties or under their personal observation." [Taylor, Evid. sec. 1429; 1 Greenl., Ev. sec. 483.]

In the case at bar it did not appear, either by statute or by compulsion of official duty, that such record should be kept. [Hegler v. Faulkner, 153 U. S. 109; State v. Pagels, 92 Mo. 300, l. c. 310; Childress v. Cutter, 16 Mo. 24, l. c. 46.] In the latter case the rule was aptly stated as follows: "It seems that the admissibility of the facts recited in these registers should depend upon the terms of the authority by which they are required to be kept."

We have been unable to find a single case where a record of the character of the one at bar was admissible in evidence, in the absence of express statutory authorization or the stamp of official duty.

In the case of Raymond v. Flint, 225 Mass. 521, 114 N. E. 811, a similar question was before the court. The party whose mental condition was under inquiry was confined in the hospital in 1896. The hospital was required by statute to keep records of the treatment and medical history of those under its care, and the court quoted from the statute to the effect that such records and "similar records kept prior to April 25, 1905, shall be admissible as evidence in the courts of the commonwealth, so far as such records relate to the treatment and medical history of such cases."

There was proof otherwise that appellant's father was insane and confined in the asylum at Fulton.

(b)   Appellant was confined in the Insane Asylum at St. Joseph twice during the year 1896, and he attempted to introduce the records of that institution relating to his own confinement. This evidence was rejected for the same reasons as set forth in paragraph

Insanity: (a) hereof. The same authorities are applicable
Asylum
Record. here as there, as there was no statutory authority for the keeping of such records and it did not appear that by custom or otherwise it was the duty of any public functionary to make and preserve them. However, the court did not reject such records *in toto,* but expressly ruled that parts of said record might be used. The parts rejected have not been preserved for our review.

Other testimony gave in detail the condition of appellant on both the occasions of his confinement at the St. Joseph Insane Asylum.

(c)   Appellant sought to introduce in evidence an article published in the Gallatin Democrat in its issue of May 30, 1918, entitled, "Will He Help Raise Hell?" for the purpose of showing the effect of such article upon the mind of appellant, and as relevant under

Insanity: his plea of insanity. This article did not re-
Newspaper
Article. fer to appellant, but was a discussion of a contest between Judge Divelbiss and Judge Alexander who were rival candidates for the Democratic nomination for Congress. The Democrat was supporting Judge Alexander, who lived at Gallatin, and the article referred to Judge Divelbiss, who resided at Richmond in Ray County. This article was published May 30th, 1918, and is as follows:

"While Judge Divelbiss was speaking for the Red Cross and conducting a personal campaign for Congress in Daviess County last week, his 'political organ' down in Ray County was 'flashed' this bit of news: 'Information received at the News office this week says that there is a probability of a new Democratic paper being launched at Gallatin within the next few weeks.' And the Judge's organ 'conceives' as the reason for the launching the

necessity of getting rid of 'Gallatin Domination' in the District—that 'nightmare' on which the Judge is galloping down and up and over and across the district vainly striving to raise a hullabaloo of sufficient magnitude to blind the people to their interests, and the country's interest in forgetting the great service Judge Alexander is rendering the Administration at this critical time.

"But the prime promoter of this 'new paper in Gallatin' is more outspoken regarding his intention—and frankly states he 'proposes to raise hell' among Democrats. It is possible that in this aspiring politician from Ray he has discovered the one he 'long has. sought and mourned because he found him not.' Failing to 'float' his project among those to whom appeal has been made locally the announcement coming from the Judge's 'personal organ' down in Ray—The News—under the suggestive circumstances naturally leaves the impression that the Ray Countian is willing to lend a hand—and more— to help 'raise hell' among Daviess County Democrats. We know of no just reason for the party in this county to be torn asunder by an aspiring politician and a self-constituted 'hell raiser.' Daviess County Democrats are just as loyal, just as patriotic and just as deserving as the Democrats of Ray or any other county and maintain an organization equally as honest and worthy of respect. They are not political pirates or domineering autocrats—but just plain Missouri Democrats, and the efforts of the young man from Ray to discredit them and tear them down for his own advancement will, we believe, meet with scant approval among the loyal Democrats in other counties in the district.

"Without a single, solitary issue of genuine merit on which to base their appeal to the voters to cast aside a Representative who has proven true and is making good in his support to the President, it seems there is to be an effort made to win by 'raising hell' among and with Daviess County Democrats. What a spectacle. But if naught else will do, bring on the editorial prodigy who in years gone set the mountains and the plains on fire

with his lurid diction and then ran away leaving them obscured in smoke.''

This article had no evidentiary value, was too remote, and the offer was properly denied.

(d)  The deceased and one Robert J. Ball, Postmaster at Gallatin, were joint owners of the above mentioned Gallatin Democrat, and because of a publication made concerning appellant in that paper a libel suit had been instituted by him as plaintiff, and this suit was being prosecuted at the date of the homicide.  In the course of that litigation a letter was written by the said Ball to Thomas H. Hicklin, one of his attorneys, which letter related to the subject-matter of such litigation and made reference to the appellant, who was plaintiff in said libel suit.  This letter was lost by Attorney Hicklin, found by one of appellant's attorneys and turned over to appellant.  It was offered in evidence, as it was said, for the purpose of showing its effect upon the mind of appellant.  The court indicated that he would not exclude the whole letter, but merely the privileged portions thereof, and appellant's counsel acquiesced in that ruling by an agreement to mark such portions as he desired to use.  No further offer was made.  Therefore, that matter is not before us for review.

*Letter to Attorney.*

(e)  After the filing of the libel suit and before the homicide several articles were printed in the Democrat, which appellant offered in evidence.  These various articles were ''offered for the purpose of showing their effect on the mind of the defendant.''  The court admitted the whole or such portions of said articles as mentioned or referred to appellant, but excluded such articles or portions thereof as did not mention or refer to him. We are unable to discover any error as against appellant by this action of the court.  He had the benefit of the articles referring to him, and there is no basis for his complaint against the exclusion of matter wholly irrelevant to any issue in the case.

*Libel Suit: Later Newspaper Articles.*

(f)   The complaint that the court' excluded testimony of family history and tradition as to the insanity and mental weakness of members of the Tarwater family is wholly without merit.

Sally Abbington, an aunt of the appellant, was called as a witness and upon inquiry said that she had learned from her mother that appellant's father, her brother, was afflicted with insanity, and from this information she expressed her opinion that he was insane. It was then sought to elicit from witness that her mother had told her that appellant's father was confined in the Insane Asylum, presumably at Fulton. The State objected to this testimony as not being a proper inquiry as to family history, and was sustained by the court. There was no error in this, as it was not the best testimony and did not fall within the exception to the hearsay rule relating to family history, and particularly in view of the fact that there were living witnesses who knew and testified concerning the confinement of appellant's father in the Asylum at Fulton.

Other matters excluded were mere statements of conclusions by the witnesses, and we do not find in the examination of the voluminous record in this case where appellant was denied the benefit of any competent or material testimony, whether in reference to his family history or otherwise.

(g)   We do not understand upon what theory appellant complains at the refusal of the court to admit in evidence the petition and answer in his libel suit against the Gallatin Democrat. These pleadings referred to an alleged libelous article printed in the Democrat and as the article itself had been read to the jury, there was no reason why the record should be further encumbered with these irrelevant and immaterial matters. Whatever appellant may have said in his petition in the libel suit could only be construed as self-serving declarations. Moreover, it appeared from the testimony of his lawyer in the libel suit

that he was not only normal during the times in question, but that he read understandingly and eagerly all the cases in Missouri on the subject of libel. This testimony was properly excluded as wholly irrelevant to any issue in the case.

(h) We must hold also that the action of the court in refusing to admit the record of the malicious prosecution suit of appellant against John W. Scudder & Co., determined in St. Louis County in 1895, was proper, as the previous testimony relating to that matter was very clear as to the results and such records would have been merely cumulative.

Malicious Prosecution: Court Records.

There was no controversy regarding the termination of the suit in question and the jury had been fully informed about that case and its ending.

II.   After the defense had offered testimony in support of the insanity plea and had concluded, the State in rebuttal offered the testimony of witness Charles Buzzard, a relative of appellant. This witness was associated with appellant in 1895, when appellant was charged and acquitted of obtaining goods under false pretense and at the time he instituted his suit against John W. Scudder & Co., for malicious prosecution. Witness Buzzard testified that appellant at that time had made threats against the lives of the judge before whom he was tried and the prosecuting attorney, who represented the State, and said that if convicted he would kill both of them and then as a defense enter a plea of insanity. This testimony in rebuttal was, in view of other testimony given in the case, competent.

Threats in Another Suit.

There was testimony for the defense that appellant was confined in the Insane Asylum twice during the year 1896 and it was very proper that the jury should know whether or not he was feigning insanity at that time as well as at the time of the trial. [State v. Bryant, 93 Mo. 273, l. c. 299; State v. Stevens, 242 Mo. 439.]

We find no just cause for complaint against other portions of the testimony of witness Buzzard.

State v. Tarwater.

III.   There was no error in permitting the exhibition of the clothing worn by the deceased at the time of the killing in evidence.   This clothing was offered for the purpose of showing the position of the deceased at the time appellant shot him, and, in view of the plea of self-defense, was competent and highly material.  Its appearance on the railing, in the presence of the jury, under the circumstances of this case, was not a matter about which appellant can properly complain.  [State v. Wieners, 66 Mo. 13, l. c. 29; State v. Buchler, 103 Mo. 203, l. c. 208; State v. Long, 209 Mo. 366, l. c. 382; State v. Allen, 290 Mo. 258.]

Clothing of Deceased.

Appellant complains of the presence of the widow of the deceased and other relatives and friends in the court room during the trial.   It does not appear that the presence of spectators, in the absence of hostile demonstrations, could have prejudiced appellant's rights, and, even if objectionable, no complaint was made and preserved for our review, so there is nothing before us.

Presence of Widow and Relations.

However, a careful reading of the entire transcript (1660 pages) does not disclose a situation that would warrant the assertion of appellant's counsel that he had not had a fair trial.   If counsel believed that the jury was being influenced by manifestations, hostile or otherwise, to the prejudice of appellant, it was their duty at the time to record their complaint, obtain a ruling from the court, and, if possible, procure a more favorable environment, and, if unsuccessful, preserve for our review their exceptions to the adverse rulings of the court. This was not done, and after the trial has been concluded and an adverse verdict returned it is then too late for them to complain.   Whatever transpired in the court-room they knew about, and a ruling of the court upon complaints properly made should have been obtained then.   We cannot entertain the complaint now.

IV.  During the *voir dire* examination of the jury and at the moment of adjournment and after the panel of jurors had been admonished by the court, Mr. Davis, of counsel for appellant, said: "We want the record to show that the defendant was removed from the court-room and taken to jail about twenty minutes ago, and that he has not been in court during a part of these proceedings, and we object to it."

Absence of Defendant.

This was all that was said regarding the absence of appellant, and no specifications were made as to what proceedings were had during his absence, and no request made to correct the error, if any, and no exception preserved for our review. This complaint is, therefore, not before us. [State v. Armstrong, 167 Mo. 257; State v. Hawkins, 210 S. W. 4, l. c. 7.] Moreover, the record shows the presence of appellant throughout the trial in accordance with the requirements of Section 4008. Being present at the beginning, such presence is presumed to continue. [State v. Temple, 194 Mo. 237, l. c. 243; State v. Church, 199 Mo. 605.]

V.  Appellant in his motion for a new trial charged that the jury were permitted to separate during the progress of the trial and *before* final submission of the case. Affidavits were filed in support of such allegation, and it appeared that the jury had separated on one occasion when ten of the jurors had been taken out for exercise by an officer, leaving two of the jurors in the room with another officer, the said two jurors being ill and being unable to accompany the ten. The ten jurors had not gone far when they met the judge sitting in the trial of the case, who directed that they be returned to their room and there kept together. Numerous affidavits were submitted by the State, showing that during the separation the jurors were under the surveillance of an officer, and that at no time were any of them subjected to improper influence. Section 4027, Revised Statutes 1919, requires that the jury shall be

Jurors: Separation.

kept together *after* they retire for deliberation, and to permit a separation *after* retirement for deliberation is reversible error.

Section 4026, Revised Statutes 1919, requires that the jury be kept together in capital cases during the progress of the trial and *before* retirement for deliberation. If they separate during the progress of the trial it will constitute a ground for a new trial unless it is made affirmatively to appear on the part of the State that the jurors were not subject to improper influence. In this case it was shown that the jurors were at all times under the immediate and close supervision of sworn officers and that they were not subjected to improper influence. This was sufficient to overcome any adverse presumptions of misconduct. [State v. Orrick, 106 Mo. 111, 17 S. W. 176, 329; State v. Spaugh, 200 Mo. 571, l. c. 608; State v. Prince, 258 Mo. 315, l. c. 328; State v. Schaeffer, 172 Mo. 335.]

VI. Dr. Charles S. Woodson was called as a witness by the defense in an effort to identify the records with respect to the confinement of appellant in the Asylum at St. Joseph in the year 1896. Dr. Woodson had qualified as an expert and upon cross-examination the State's attorney propounded to him a hypothetical question touching the question of the insanity of the defendant. Objection was made upon stereotyped grounds, and appellant's counsel was asked to supply such facts as he believed were in evidence and yet omitted from the hypothetical question. He did this and same was accepted by the questioner. The answer was unfavorable to appellant. Under such circumstances, appellant had no right to complain and, moreover, further examination of his witness, following the answer to the State's hypothetical question, was of such nature as fully and fairly to present to the jury any weaknesses according to his theory in the hypothetical question and the answer thereto. This point is ruled against appellant.

*Hypothetical Question.*

It was held in the case of State v. Ferguson, 278 Mo. 119, l. c. 136, that it was not error for the State in putting a hypothetical question to an expert witness to frame the question in accordance with the State's theory of the evidence, and furthermore it was held not essential that the facts should be stated as they actually exist, nor that the question would be improper because including only a part of the facts in evidence. To the same effect it was ruled in the case of State v. Bell, 212 Mo. 111, l. c. 124, and State v. Privitt, 175 Mo. 207, l. c. 225.

VII. Lastly, appellant complains that his motion for a new trial should have been sustained because he says the verdict was manifestly the result of passion and prejudice, and superinduced by pressure

Passion and Prejudice: Insanity.

of public sentiment and not warranted by the evidence. Under this heading appellant marshals his facts, both on the side of his plea of self-defense and that of insanity. It is not urged by him by demurrer that there was insufficient testimony to warrant his conviction, but that upon the facts, as they were adduced by him, this court ought to be convinced that the defendant was insane and irresponsible at the time he fired the fatal shots. We cannot so say.

On his plea of self-defense, there was ample countervailing testimony to the effect that he was the aggressor and that without provocation he fired the fatal shots into the body of the deceased. On that question there was an issue for the triers of the fact. They determined the issue adversely to appellant and we are without authority to disturb the verdict. Note the dying declaration of the deceased:

"I, Wes L. Robertson, believing that I am mortally wounded and that I cannot live, make the following statement as a dying declaration:

"Hugh Y. Tarwater came into my office on the afternoon of the 23rd day of December, and said to me, 'I want it understood that I do not want anything published in this paper (meaning the Gallatin Democrat) in which

State v. Tarwater.

my name appears,' and I said, 'We are running this paper and will print what we want to.'

"He repeated the request again and I do not remember what I said to him we both standing and he again said, 'You understand that I do not want anything printed about me in your paper' and I do not remember what I said but he commenced shooting me.

"This is about all I remember about it.

"W. L. ROBERTSON."

Where there is substantial evidence tending to prove an essential fact, the Supreme Court will not disturb the action of the trial court in submitting such issuable fact to the jury upon proper instructions. [Orblitt v. Bergfeld, 191 S. W. 998.]

The trial court was most liberal in the latitude allowed appellant in the testimony offered to prove insanity. This was proper under all of the authorities. [State v. Morris, 263 Mo. 339, 172 S. W. 603; State v. Porter, 213 Mo. 43, 111 S. W. 529; State v. Speyer, 194 Mo. 459, 91 S. W. 1075.]

No limitation is fixed by law as to the time within which the inquiry as to the mental condition of accused is to be directed, but the facts admitted in evidence should be restricted to those which have some tendency to show the mental condition of accused at the time of the commission of the act charged, as that is the ultimate fact to be proved under a plea of insanity. [State v. Morris, supra; 16 C. J. p. 557, sec. 1081; State v. Rose, 271 Mo. 17.]

There was testimony that appellant was afflicted with hallucinations and delusions as late as Saturday night before the killing on Tuesday, but the State offered in rebuttal testimony which tended to show that such hallucinations or delusions were the result of intoxication. It appeared on behalf of the State that on Saturday night, before the killing, appellant returned from Kansas City intoxicated, and as one of the witnesses put it, who saw him on the train on Saturday evening, he was "dog drunk" and that his hallucinations on that

State v. Tarwater.

evening were the vagaries of a brain disordered from strong drink.

During the night following, according to the testimony of his wife, appellant suddenly sprang from his bed, seized his revolver, averring that he saw the faces of Mr. Ball, the partner of deceased, and some of the attorneys in the libel suit, peering in at the window; he fired his revolver at these fictions of his brain and then retired, protesting that he was being pursued by his enemies.

There was other testimony that he suffered with insomnia; that he requested his friends to accompany him home from his office because of the shadowing of those opposed to him and his fear that he would be harmed by them. There was testimony that often he even sat by his window at nighttime, revolver in hand for his protection against the presence of imaginary foes.

On Sunday evening before the homicide he wrote the following letter, which was found in his room or study after the homicide, and while he was incarcerated in jail:

"Mr. Dudley—

"They were here again to-night and last night. Last night in the depot at Kansas City they resorted to every bastardly means the criminal brain of the devil could invent to cause me to commit some overt act that would give them a chance to prefer insanity charges against me, and force me to the alternative of dismissing my libel suit or having that unfortunate insanity skeleton put on public parade which is being done by that prince of traitors Tom Hicklin: On the train they held high carnival and sported in ecstatic glee as they laughed in derision and boasted themselves of having their heel upon my neck. Not satisfied with their revelry on the train they thought to put more of it into execution and followed me to my house where Hicklin, Cruzen and Ball intended to kill me and my wife. The bull dog we kept in the house aroused me by barking furiously, barking and running from one window to the other, and get-

ting up and taking my revolver I saw Cruzen, Hicklin and Ball slinking along the west side of the house—and I opened fire to scare them away and I was dissuaded from following them as they ran west toward the mill by my wife throwing her arms around me and pleading for me to put out the light or they would shoot me through the window. When I had shot my last cartridge I put out the light. They are a cowardly lot, as soon as I began to fire they ran.

"Lewis told me they were going to take depositions at Cruzen's office. I know they are seeking my life and I am going to summons Atch, George and Fred Rottman to be there for the purpose of protection: And if Tom Hicklin and Scott Miller attempt to pull off what I under- stand they are going to I am not going to stand for it. The last time they took depositions I told Arch and George Bock and Fred to be there but they forgot it. So I am going to be on the safe side this time and issue process to testify so I will be sure to have them there, for I know that Cruzen and Hicklin from what they done at Kansas City in trying to secure perjured testi- mony against me intend to have Luther Williams there to kill both myself and John Everman. I don't expect any shooting to take place because with Atch and George and Fred there, they will be afraid to start anything, but if they do, I had rather get Hicklin the arch traitor, than Ball, or Cruzen. But I shall first be sure that my attorneys are beyond danger. I don't care for my own life, but my sweet daughter that I have sent 2000 miles from home to get her away from the assaults made upon me every week by Robertson and Ball, as well as my wife and son don't know the war that is raging every hour in my heart, nor what a struggle it is to me to ward off mental collapse. They lurked around my house un- til—"

There was testimony for the State that he was sane at all times; that he was an efficient and capable business man; that there was nothing abnormal noticeable in his conduct and even from some of his own witnesses it ap-

peared that he was a normal, intelligent man at all times. It appeared that he had been discharged from the asylum both times in 1896 as cured, so that no presumption ran in favor of his plea.   [State v. Rose, supra, 195 S. W. 1013.]

It appeared from the State's witnesses that on the afternoon of the homicide he was markedly under the influence of liquor; that aside from his intoxication he was in normal condition, and his conduct at the time of the killing and immediately thereafter did not provoke challenge as to his sanity.   It was shown that he bought cartridges for his pistol a few days before the tragedy, and that he was embittered toward the deceased.

On his plea of insanity, there was testimony for the triers of the fact and they determined that question adversely to him.   It is the settled law of this State that whether the defendant was insane and, therefore, not responsible for his act, was a question of fact for the jury who tried the case, and it was for them to weigh all the evidence and determine whether or not he was sane or had the mental capacity to distinguish between the right and the wrong of his act.   As was well said by GANTT, J., in the case of State v. Barker, 216 Mo. 532, l. c. 549, 115 S. W. 1102:

"This court has on many occasions with evidence fully as cogent as to the insanity of the defendant refused to interfere with the verdict of the jury where the instructions were correct and fair to the defendant, and we must decline to interfere with the verdict in this case on that ground."

No complaint is made as to the correctness and fairness of the instructions in the case at bar.

We find nothing in this case on that issue more unusual than in the following cases:  State v. Pagels, supra; State v. Duestrow, 137 Mo. 44;  State v. Soper, 148 Mo. 217;  State v. Baker; 246 Mo. 357, 152 S. W. 46;  State v. Rose, supra.

A careful examination of all of the assignments of error made by appellant and a careful reading of the

record fails to disclose any reversible error, and we accordingly affirm the judgment of the trial. court. It is so ordered. *Railey, C.,* concurs; *White, C.,* not sitting.

PER CURIAM:—The foregoing opinion by REEVES, C., is adopted as the opinion of the court. All of the judges concur.